_____

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

_____

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,

Debtors,

_____

UBS FINANCIAL SERVICES INC., f/k/a UBS Financial Services Incorporated of Puerto Rico,

Movant - Appellee,

v.

ESTATE OF PEDRO JOSÉ NAZARIO SERRANO; ESTATE OF JUANITA SOSA PEREZ; JOEL RIVERA MORALES; MARÍA DE LOURDES GÓMEZ PÉREZ; HÉCTOR CRUZ VILLANUEVA; LOURDES RODRÍGUEZ; LUIS M. JORDÁN RIVERA,

Objectors - Appellants,

OFFICIAL COMMITTEE OF UNSECURED CREDITORS; DRIVETRAIN, LLC, in its capacity as the Trustee of the Commonwealth Avoidance Actions Trust,

Respondents - Appellees.

---

## OPENING BRIEF FOR OBJECTORS-APPELLANTS

---

Harold D. Vicente
Harold D. Vicente Colón
Vicente & Cuebas
P.O. Box 11609
San Juan, PR 00910-1609
Phone No. (787) 751-8000
Fax No. (787) 756-5250

# I.     TABLE OF CONTENTS

Page(s)

III.   JURISDICTIONAL STATEMENT…………………………………………1

IV.   STATEMENT OF THE ISSUES FOR REVIEW…………………………...1

V.   STATEMENT OF THE CASE ……………………………………………..4

(a) The Claims and the District Court's Decision to Enjoin……………….. 4

(b) Background of the Issue……………………………………………………7

(c) The Parties' Position before the District Court……………………….... 8

(d) The Prior Rulings Impacting this Case…………………………………11

VI.   SUMMARY OF THE ARGUMENTS……………………………………...13

VII.   ARGUMENTS…………………………………………………………..15

1.     The District Court erred in enjoining Plaintiffs-Appellants from
       Continuing to pursue the Commonwealth Action by failing to
       adequately consider the independent and direct duties owed by
       UBS to the Plaintiffs-Appellants as investors in the ERS…...………15

       A.     Standard of Review……………………..…………………………15

       B.     Applicable Law……………………………………………………16

              (i)     The District Court's limited jurisdiction to enjoin
                      third-party litigation…………………………………………16

              (ii)    UBS' breach of its "highest fiduciary duty" under
                      PRUSA is actionable as an Article 1802 damages
                      claim……………………………………………………...19

       C.     Discussion of Error…………………………………………22

i.    The District Court erred in disregarding UBS' direct duty towards Plaintiffs-Appellants under PRUSA's highest fiduciary duty and Article 1802…………………..25

ii.   The District Court erred by placing undue weight on the purported need to have allegations of "direct contact between UBS and the ERS Beneficiaries individually" for Plaintiffs-Appellants to posit a direct claim against UBS…………………………………….34

iii.  The District Court erred by focusing its decision on inapposite Second Circuit case law which has been questioned by that same Circuit Court of Appeals…………38

iv.   The District Court erred by misconstruing the scope of Act No. 3-2013, a task that also falls under the jurisdiction of the Puerto Rico state courts………………..45

VIII.  CONCLUSION…………………………………………………………….48

## II.    TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accord United States v. Finnerty*,
533 F.3d 143, 148 (2d Cir. 2008)……………………………………………………35

*Am. Nat'l Bank of Austin v. MortgageAmerica Corp.*
*(In re MortgageAmerica Corp.),* 714 F.2d 1266, 1274 (5th Cir. 1983)………….. 16

*Asociación de Enfermería Visitante Auffant, Inc. v. Great-West Life &*
*Annuity Ins. Co.,* 775 F. Supp. 2d 333 (D.PR 2010)………………………..……… 25

*Caplin v. Marine Midland Grace Trust Co.*,
406 U.S. 416, 92 S. Ct. 1678, 32 L. Ed. 2d 195 (1972)………………………..17,39

*Charles Hughes & Co. v. Securities & Exchange Com.,*
139 F.2d 434, 437 (2d Cir. 1943*), cert denied 321 U.S. 786 (1944)*…………….. 37

*Colon Santos v. Coop. Sec. Mult. PR*, 173 DPR 170, 186 (2008)……………….. 21

*Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1 (1st Cir. 2022)…………………..29

*Duker & Duker*, 6 S.E.C. 386, 388 & n. 5 (1939)………………………..………… 36

*Efreom v. McKee*, 46 F.4th 9, 19 (1st Cir. 2022)………………………………… 47

*Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746, 753 (5th Cir. 1995)…………19

*Ferrari v. Barclays Business Credit*, 87 B.R. 745, 750
(BK Dist. M.A. 1988)……………………………………………………………...…48

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 382-383 (1983)…………...…35

*Hernández Vélez v. Televicentro*, 168 DPR 803, 815 (2006)……………………… 22

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp.*
*(In re Seven Seas Petroleum, Inc.*), 522 F.3d 575 (5th Cir. 2008)…...16,17,18,37,42

*Hirsch v. Arthur Andersen & Co*., 72 F.3d 1085 (2nd Cir. 1995)……………...18,40

*In re E.F. Hutton Sw. Props. II, Ltd.*, 103 B.R. 808, 812
 (Bankr. N.D. Tex. 1989)……………………………………………………………. 17

*In re Educators Group Health Trust*, 25 F.3d at 1284…………………… 16,17,19

*In re Times Square JV LLC*, 648 B.R. 277, 287 (BK S.D.N.Y. 2023)………….. 46

*Johns-Manville Corp. v. Chubb Indem. Ins. Co.*
*(In re Johns-Manville Corp.)*, 517 F.3d 52 (2nd Cir. 2008)……………………18,40

*López v. Porrata Doria*, 169 DPR 135, 150 (2006)……………………………... 20

*Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*,
740 F.3d 81 (2nd Cir. 2014) ("Madoff II")………………………………………. 15

*Mendez Moll v. AXA Equitable Life Ins. Co.*, 202 DPR 630 (2019)…………….. 35

*Nieves Diaz v. González Massas*, 178 DPR 820, 843 (2010)………………… 20,21

*Paramedics Electromedicina Comercial, Ltda. v.*
*GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 651 (2d Cir.2004)*……………….15

*Picard v. JPMorgan Chase Bank & Co.*
*(In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013)……………38

*Pons v. Engebretson*, 160 DPR 347, 355 (2003)………………………………21,22

*Ramos v. Carlo*, 85 DPR 353, 358 (1962)……………………………………….. 21

*Robinhood Financial, LLC v. Secretary of the Commonwealth*,
492 Mass. 696 (August 25, 2023)……………………………..……….. 29,30,31,32

*Rodriguez Camacho v. Doral Fin. Corp. (In re Rodriguez Camacho)*
 361 B.R. 294, 298 (1st Cir. BAP 2007)…………………………………………….1

*Sagardía De Jesús v. Hospital Aux. Mutuo*, 177 DPR 484, 505 (2009)…………..22
*Schertz-Cibolo-Universal City, Indep. School District v. Wright*
*(In re Educators Group Health Trust),* 25 F.3d 1281, 1285

(5th Cir. 1994) …………………………………………………………...16,19

*SEC v. Dorozhko,* 574 F.3d 42, 50 (2d Cir. 2009)………………………………..34

*SEC v. Great Lakes Equities Co*., 1990 U.S. Dist. LEXIS 19819………………..36

*SEC v. Tambone*, 597 F.3d 436 (1st Cir. 2010)…………………………………… 36

*Shearson Lehman Hutton, Inc. v. Wagoner,*
944 F.2d 114, 117 (2d Cir. 1991)………………………………………………40

*St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*,
884 F.2d 688, 700 (2d Cir. 1989)…………………………………………………18,38

*Stonebridge Inv. Partners, LLC v. Scientific Atlanta,*
552 U.S. 148, 158 (2008)…………………………………………………………..34

*The Mediators, Inc. v. Manney (In re Mediators, Inc.),*
105 F.3d 822, 826 (2d Cir. 1997)………………………………………………40

*The Wharf (Holdings) Ltd. V. United Int'l Holdings, Inc*.,
532 U.S. 588, 596-597 (2001)……………………………………………………34

*Travelers Indem. Co. v. Bailey,*
557 U.S. 137, 129 S. Ct. 2195, 174 L. Ed. 2d 99 (2009)………………………….18

*United States v. O'Hagan*, 521 U.S. 642, 655 (1997)……………………………35

*Valle v. E.L.A*., 157 DPR 1, 18 (2002)…………………………………………21

**Statutes**

3 PR Laws Ann. §§ 786-1, et seq……………………………………………… 45

10 PR Laws Ann. §§851………………………………………………………19,28

10 PR Laws Ann. §890h……………………………………………………….35

11 U.S.C. § 541(a)(1)……………………………………………………….16

28 U.S.C. § 1291……………………………………………………..1

28 U.S.C. § 1331……………………………………………………..1

31 P.R. Laws Ann. § 5141……………………………………………..20

48 U.S.C.§ 2166(a)(1)………………………………………………..1

48 U.S.C. § 2166(e)(1) and (2)………………………………………1

G. L. c. 110A, § 204 (a) (2) (G)…………………………………..30

**Other Authorities**

Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 174 (2012)……………………………………………………….29

J. Puig Brutau, Fundamentals of Civil Law, Barcelona, Ed. Bosch, 1983, T. 2, Vol. 3, p. 92……………………………………………………22

## III. <u>JURISDICTIONAL STATEMENT</u>

The District Court had jurisdiction under 28 U.S.C. § 1331 and 48 U.S.C. § 2166(a)(1). Pursuant to 28 U.S.C. § 1291 and 48 U.S.C. § 2166(e)(1) and (2), this Court has jurisdiction over the current appeal from the District Court's November 29, 2022, Opinion & Order granting UBS Financial Services Incorporated of Puerto Rico' Motion to Enforce the Plan of Adjustment and for Related Injunctive Relief and said Court's January final Order Denying Motion for Reconsideration Under Bankruptcy Rule 9023. Add. 001-014 & 015-021, respectively.

The District Court's Order is a reviewable "final decision" because it enjoined the Plaintiffs-Appellants, based on the Plan of Adjustment issued under PROMESA, from proceeding with the state court action seeking redress against UBS. *Rodriguez Camacho v. Doral Fin. Corp.* (*In re Rodriguez Camacho*), 361 B.R. 294, 298 (1st Cir. BAP 2007) (explaining that order denying relief from judgment is final if underlying order is final and, together, they end the litigation on the merits). Plaintiff-appellants filed a timely notice of appeal on February 24, 2023. App. 1406.

## IV. <u>STATEMENT OF THE ISSUES FOR REVIEW</u>

The District Court erred in enjoining individual Plaintiffs, Pedro José Nazario Serrano, Juanita Sosa Pérez, Joel Rivera Morales, María de Lourdes Gómez Pérez, and Luis M. Jordán Rivera, investors and beneficiaries of the Employees' Retirement

System ("ERS Beneficiaries" or "Plaintiffs-Appellants"), from continuing to prosecute their independent 11-year-old state-law damages action for breach of good faith, fair dealing and fiduciary duties (the "Commonwealth Action") against UBS Financial Services Incorporated of Puerto Rico ("UBS") and UBS Consulting Services of Puerto Rico ("UBS Consulting"), because the District Court mistakenly characterized their claims as derivative from a separate contractual federal action filed by the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"),[1] by:

(1) failing to adequately consider that UBS Financial Services Incorporated of Puerto Rico ("UBS"), under Puerto Rico's Uniform Securities Act ("PRUSA"), as an investment advisor, is subject to the "highest standard of fiduciary duty" towards both its customers (i.e., the ERS system) *and* investors (i.e. the ERS Beneficiaries whose own funds were invested in the system);

(2) failing to consider that under the securities laws, including PRUSA, conduct alone can be deceptive and actionable under longstanding liability principles;

---

[1] The ERS' claim was distinctly based on the ERS' contractual relationship with UBS, and it has declined to continue pursuing the Commonwealth Action. Thus, only the individual Plaintiff-Appellants remain.

(3) failing to consider the Second Circuit's leading view analyzing derivative claims and relying instead on inapposite case law; and

(4) failing to adequately consider that another Puerto Rico statute, Act No. 3-2013, gave Plaintiffs-Appellants a private right of action and direct standing to sue UBS "for damages caused to the System *or its beneficiaries.*" (Emphasis added.)

These different sets of fiduciary duties towards customers (the ERS) *vis-a-vis* investors/beneficiaries (Plaintiffs-Appellants) are not mutually exclusive and can give rise, as happened here, to separate actions stemming from the same or similar nucleus of facts.

In sum, here the District Court had to determine whether UBS owed the Plaintiff-Appellants a separate fiduciary duty under state law. And we mention that this case is different from other general Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") retirement system cases in the sense that UBS, *seeking to maximize profits at the expense of others*, chose to engage in multiple conflicting roles by acting simultaneously as (i) the investment advisor, and (ii) the underwriter of a $3 Billion pension bonds issuance ("POB") for the ERS, which mortally wounded the latter. By blurring those lines and consequentially its obligations, UBS breached its strict fiduciary duty to alert the investors (Plaintiff-Appellants), *to which it was de facto providing investment advice via endorsement,*

3

of the inherent risk to the ERS' financial position (and its underlying investments by future retirees) that the POB issuance entailed.

As such, UBS failed to meet its strict fiduciary standards under state law and such failure gives rise to an independent cause of action and right to compensation, separate and distinct to the damages suffered by the ERS. Notably, Puerto Rico is one of at least five (5) U.S. jurisdictions with *BlueSky's* laws which recognize such claims as actionable. Only the ERS' damages claims were transferred to other general creditors under the Plan of Adjustment.

## V. <u>STATEMENT OF THE CASE</u>

### (a) The Claims and the District Court's Decision to Enjoin

This case deals with a group of individual investors, who were forced to invest their money and life savings, as governmental employees, into a *compulsory* state retiring system, but now have been enjoined from pursuing their investor claim to recover the direct damages suffered to their personal investments after the historic debacle of Puerto Rico's finances, including the ERS funds.

In sum, Plaintiffs-Appellants are investors who placed their funds in the ERS that were directly harmed by UBS' recommendations and advice to issue $3 billion in POBs to inject liquidity into that retirement system. UBS knew or should have known that said issuance was inadequate to properly fund the ERS and, contrary to helping it, would cause its demise. According to the brokerage firm Merrill Lynch,

Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), the firm advising on the issuance prior to UBS interceding, a minimum issuance of $7 Billion in POBs was necessary to properly secure the ERS' liquidity. App. 751-752, Docket No. 21651. UBS knew or should have known that its own issuance *for less than half that amount* made no sense and would directly harm the Plaintiffs-Appellants' personal investments in the ERS by triggering exactly what occurred to the ERS.

Despite that scenario, the District Court ruled that Plaintiffs-Appellants lacked a direct claim and were prohibited from pursuing their claims in state court (against UBS in its capacity as *investment advisor*) because their damages were secondary in nature and flowed from the contractual damages suffered by the ERS system itself, *via* the ERS' relationship with UBS (as its bonds *underwriter*). Addendum 001-014, Memorandum Opinion and Order Granting the Motion to Enforce the Plan dated November 29, 2022. Erroneously viewing Plaintiffs-Appellants' claims from the paradigm of claiming to "recoup damages suffer[ed] by the ERS or by ERS plan participants or pension beneficiaries by reason of an underwriter's business dealings with UBS, [the District Court deemed] the cause of action derivative of the ERS' claims." App. 1420-1421, Docket No. 22927. And by equating their claim to the ERS' injury, it also ruled that the Confirmed Plan of Adjustment had addressed and transferred the ERS' assets to other creditors, so Plaintiffs-Appellants could no longer assert their action. That decision is in direct confrontation with PRUSA's

*uberrima fides* standard and ignores the multiple roles performed by UBS as (i) broker-dealer,[2] (ii) investment advisor and (iii) underwriter of Puerto Rico's bond issuances and the ERS system itself.

The effect of that decision, perhaps unintended by the District Court, was to forever close the doors of the judicial system for Plaintiffs-Appellants to recover their hard-earned investment or retirement savings. Their claim, under the District Court's logic, now belongs to other creditors of the Commonwealth of Puerto Rico (who bear no relationship to them) and is also left to the total discretion of an Avoidance Actions Trustee, who can pursue, settle, or simply abandon them without even consulting with the Plaintiffs-Appellants. By the same token, the District Court's decision has the effect (perhaps also unintended) of granting UBS immunity from their catalog of infringements in direct violation of the "highest fiduciary duty" they owed to Plaintiffs-Appellants as expressly mandated by PRUSA. The effect was to disallow Puerto Rico's BlueSky laws and Article 1802's general duty of care, both of which recognize such claims.

---

[2] In addition to its direct role with the ERS (and its underlying investments) as an Investment Advisor and Underwriter, UBS had an equally prominent role as a broker-dealer advising its retail clients to purchase the POBs, as part of UBS' closed-end funds marketed to Puerto Rico residents. As such, it generated profits from all sides of the equation. That is, from (i) advising the ERS on its investments, (ii) from underwriting the POB issuance; and (iii) from selling those very same POBs to its retail clients.

This, because the District Court reasoned that UBS did not owe any direct duty to Plaintiffs-Appellants because the claims pursued in the Commonwealth Action flowed from the ERS' dispute with UBS.

All in all, Plaintiffs-Appellants' investment and retirement money has been confined into an investment retirement system without the right to seek compensation for UBS' irresponsible investment advice and decisions; an entity that served the ERS and who had its hands all over the ERS's investment strategy, highly contributing to its collapse. This is simply wrong. Whether UBS is ultimately liable to Plaintiffs-Appellants for its conduct and whether such conduct is consistent with PRUSA and UBS' general duties under Puerto Rico law is a question to be decided by the Puerto Rico state court system in the Commonwealth Action.

**(b) Background of the issue**

Plaintiffs-Appellants, a group of individuals composed by Pedro José Nazario Serra, Joel Rivera Morales, María de Lourdes Gómez Pérez, Héctor Cruz Villanueva, Lourdes Rodríguez, Luis M. Jordán Rivera, and Juanita Sosa Pérez, are investors and beneficiaries of the ERS. They appeal, in their individual capacity as investors in the ERS, the District Court's decision, in its Memorandum Opinion and Order Granting the Motion to Enforce the Plan (Add. 001-014), enjoining them from

continuing to prosecute their longstanding state-court action.[3] That state action, as it relates to Plaintiffs-Appellants, focused on UBS' separate and independent breach of its good faith, fair dealing, and highest fiduciary duties directly towards them as investors in the ERS. App. 0769, 0775-0776, D.E. 21651-1, tendered Fourth Amended Complaint.

The District Court, however, sided with UBS and found that Plaintiffs-Appellants' claims were derivative claims based on an injury sustained by the ERS as opposed to direct claims based on an injury sustained individually by the ERS Beneficiaries. App.1349, D.E. 22927 p. 11.

### (c) The parties' position before the District Court

On July 28, 2022, UBS filed a motion titled "UBS Financial Services Incorporated of Puerto Rico's Motion to Enforce the Plan of Adjustment and for Related Injunctive Relief". App. 707, Docket No. 21651. Essentially, UBS moved the District Court to issue an Order, allegedly pursuant to Section 91.1 of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico et al. (the "Plan of Adjustment" or the "Plan") to enjoin the ERS and Plaintiffs-Appellants, in their individual capacity as beneficiaries of the ERS, from litigating the case *Administración de los Sistemas de Retiro de los Empleados del*

---

[3] Plaintiffs-Appellants also filed a motion for reconsideration (App. 1353-1361), which the District Court denied (Add. 015-021).

*Gobierno y la Judicatura de Puerto Rico v. UBS Financial Services Inc. of Puerto Rico*, Civ. No. KAC-2011-1067 ("Commonwealth Action"), which is pending before the Court of First Instance, Superior Court of San Juan.

Basically, UBS contended that the ERS no longer owns the claims asserted in the complaint pending before the local court, because the claims in the local court supposedly are the same claims brought in the case captioned *Drivetrain, LLC v. Barclays, et al.,* Adv. Proc. No. 19-000280-LTS (the "Underwriter Adversary Action"), which were transferred to the Avoidance Actions Trusts. In the alternative, UBS contended that even if the claims have not been transferred to the Avoidance Actions Trust, they would still not belong to the ERS because the ERS transferred all of its remaining assets to the Commonwealth of Puerto Rico. At the same time, UBS argued that Plaintiffs-Appellants, as former ERS beneficiaries, have no remaining interest in the Commonwealth Action because:(i) derivative standing has been lost, (ii) the ERS beneficiaries do not have any direct, personal claims against UBS, and (iii) Act No. 3-2013 does not provide a basis to recognize individual claims separate from the ERS's claims. Lastly, UBS contended that the balance of the equities supports enjoining further prosecution of the Commonwealth Action.

Plaintiffs-Appellants countered explaining that, in summary, the claims brought in the Commonwealth Action are not the same as the claims asserted in the Underwriter Adversary Action. App 885-900. The Underwriter Adversary Action

Complaint essentially seeks rescission of the Purchase Contract and the disgorgement of the profits, fees and commissions generated by UBS, whereas the Commonwealth Action seeks to recover the damages inflicted upon the ERS Individuals, investors/beneficiaries, including lost benefits, as result of UBS' tortious conduct and breach of its fiduciary duty involving the issuance of the POBs.

More specifically, Plaintiffs-Appellants emphasized that the Commonwealth Action is one seeking damages to the investor/beneficiaries, resulting from gross negligence and UBS' failure to comply with its duty under the PRUSA, pursuant to which, prior to the issuance of the POBs, UBS had the obligation to provide advice consistent with the highest standards of fiduciary duty ("*Uberrima Fides*"). UBS' strict fiduciary duty under PRUSA and under Article 1802 is separate and distinct from the contractual claims raised in the action pursued by the Avoidance Action Trustee. As such, there is no duplicity and there is no overlapping.

Additionally, any concerns about the original causes of action pursued by the ERS in the Commonwealth Action are now gone, inasmuch as the ERS has not continue to pursue its causes of action in the Commonwealth Action. As such, Plaintiffs-Appellants are the only remaining claimants before the local court, further insulating their claims from those pursued by the Avoidance Action Trustee.

Plaintiffs-Appellants also explained to the District Court how the confirmation and consummation of the Plan of Adjustment may protect some of the

Plaintiff-Appellants' original pension benefits but said possible protection does not preclude the Plaintiff-Appellants from claiming their net losses pursuant to the Commonwealth Action.

**(d) The prior rulings impacting this case.**

Eleven years of state court litigation have not come in vain. On various instances, the local courts have made determinations contradicting UBS' position before the District Court. These decisions deserve credence and should have been weighed by the District Court. They also show how UBS' legal strategies have not been well received before the local courts, who are primarily charged with interpreting local law, and further underscores the importance of Plaintiffs-Appellants' right to have their day in court in the forum of their choosing.

For example, the local court rejected UBS' claim that the Commonwealth Action also involved allegations that the POB issuance was *ultra vires* or invalid; an argument raised by UBS to equate the allegations in the Commonwealth Action with the allegations in the federal action under the Avoidance Actions Trustee's control. During a November 26, 2019 hearing, the Commonwealth Court made it pellucidly clear to UBS that the issue of the POBs' validity was not a matter under its consideration. The Court stated:

> HON. JUDGE: …Now, another thing that attorney Hernández Denton said. **This case, the controversy I have to resolve is not the same as the one in the Federal Court.** And what they do there, well, fine and

dandy. Whatever they do there. I don't have -- my jurisdiction doesn't extend that far. **So in this case the evidence that is going to be sought is the evidence pertaining to the allegations about the nature of the transaction between UBS and the Retirement System. Look, what's at issue here is which representations, if any, did UBS make to the Retirement System when it sold, marketed, devised or did not devise the sale of these bonds**. That's a controversy in this case. So that's evidence that I need.

App. 890, quoting transcript of Hearing held on November 26, 2019 - page 35, lines

10-24 to page 36. (Docket No. 12577 in Case No. 17-3283). (Emphasis added.)

During that same hearing, despite UBS' insistence that the validity of

the Bonds was in controversy, the Commonwealth Court further stated:

HON. JUDGE: **Again. Here it's being alleged that UBS gave an advice deviated from the fiduciary duty that, according to the plaintiffs, it had to the Retirement System. Because it wanted to profit from that sale. Because as a result of that sale, it collected $35 million in commissions.**

**And, then, the Retirement System followed UBS' recommendations and by following the UBS' recommendations, well, it was negatively impacted because the recommendations given by UBS did not generate the expected results.**

**There's no mention here that those bonds are wrongly issued, are illegal, whatever. I'm not going to resolve that, the validity of the bonds.** They've already been issued.

App. 891, quoting transcript of Hearing held on November 26, 2019 - pages 6162. (Docket No. 12577 in Case No. 17-3283.) (Emphasis added.)

Moreover, on August 30, 2013, the Commonwealth Court of Appeals, in the

case captioned *Pedro José Nazario v. UBS*, KLAN201300738, ruled that the ERS

Individual Plaintiffs have legal standing to prosecute the Commonwealth Action *pro se*. While doing so, the Court of Appeals referred to the ERS Individual Plaintiffs as the "people of flesh and bones who directly hold the right they claim." App. 1328.

## VI. <u>SUMMARY OF THE ARGUMENTS</u>

The District Court erroneously enjoined Plaintiffs-Appellants from continuing to prosecute the Commonwealth Action, which entails direct claims against UBS for breach of its fiduciary duty and general duty of care under Article 1802 towards them when advising on the issuance of the $3 Billion in POBs, because it characterized their claims as derivative of separate contractual-based claims raised in a federal action filed by the ERS titled *Drivetrain, LLC v. Barclays, et. al.*, Adv. Proc. No. 19-000280-LTS. Further and dovetailing into that ruling, the District Court also deemed that the claims asserted in that federal action had been transferred to other creditors pursuant to the Plan of Adjustment and therefore not actionable by the Plaintiff-Appellants.

The District Court certainly identified the Plaintiff-Appellants' *tort* and breach of fiduciary duty claims against UBS, but without explaining much deemed them "derivative from contractual relations between UBS and ERS that allegedly result in harm to the ERS." App. 1419 at ¶ 3.

In doing so, it failed to acknowledge that under Puerto Rico securities laws, such as PRUSA, Puerto Rico Act No. 3-2013, and its *tort* statute, Plaintiffs-

Appellants as investors in the ERS possess direct claims against UBS in its advisory capacity. Fortunately for them, Puerto Rico is one of at least five (5) U.S. jurisdictions with BlueSky laws which recognize such claims as actionable.

Undoubtably, UBS engaged in a conflict of interest by simultaneously covering the roles of (i) broker, (ii) investment advisor, and (iii) underwriter of the POBs that finally crashed the ERS. It blured those lines to maximize its profits and breached its strict fiduciary duty, *under state law*, to Plaintiff-Appellants by failing to advise them of the inherent risk of the POBs to the ERS and the ERS' underlying investments which are owned by Plaintiff-Appellants. That conduct and the serious damage that it caused triggered the investors' claims set forth in the Commonwealth Action, which are separate and distinct from the ERS' own right to damages compensation. And since only the ERS' claims were transferred to other general creditors under the Plan of Adjustment, the separate Commonwealth Action should be allowed to proceed.

Thus, the issue to be resolved is whether as investors placing their funds in the hands of UBS as an investment advisor, the Plaintiffs-Appellants were entitled to a duty of care from UBS, separate and distinct from any contractual duty (or otherwise) owed by UBS to the ERS.

UBS chose to do business in Puerto Rico via blurred lines and to take advantage of the Plaintiff-Appellants for significant profit. Thus, the island's

securities laws apply to it, as well as Puerto Rico's far-reaching tort statutes anchored on hundreds of years of tradition under its civil law roots. Accordingly, UBS should not be granted *de facto* immunity because the District Court was confused or failed to correctly evaluate the issues based on the clear statutory language of the applicable state laws and the history of state court rulings. Significant caselaw in this Brief supports the Plaintiff-Appellants' position.

## VII. <u>ARGUMENTS</u>

1. <u>**The District Court erred in enjoining Plaintiffs-Appellants from continuing to pursue the Commonwealth Action by failing to adequately consider the independent and direct duties owed by UBS to the Plaintiffs-Appellants as investors in the ERS.**</u>

### A. <u>Standard of Review</u>

As relevant here, where Plaintiffs-Appellants have been enjoined from prosecuting the Commonwealth Action, "[t]he standard of review for the grant of a permanent injunction, including an anti-suit injunction, is abuse of discretion." *Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 740 F.3d 81 (2nd Cir. 2014) ("Madoff II") (citing *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 651 (2d Cir. 2004)*; *see also Sims v. Blot (In re Sims)*, 534 F.3d 117, 132 (2d Cir. 2008) (explaining the term of art "abuse of discretion" as a ruling based on "an erroneous view of the law or on a clearly erroneous assessment of the evidence, or . . . a decision that cannot be located within

the range of permissible decisions." (internal quotations and citations omitted)). Here, the District Court employed an erroneous view of the law, as explained below, by failing to consider the direct duty owed by UBS to the Plaintiffs-Appellants as investors in the ERS.

Moreover, "[w]hether a specific cause of action belongs to a bankruptcy estate is likewise a matter of law that we decide by reference to the facial allegations in the complaint." *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.*), 522 F.3d 575 (5th Cir. 2008) (citing *Schertz-Cibolo-Universal City, Indep. School District v. Wright (In re Educators Group Health Trust),* 25 F.3d 1281, 1285 (5th Cir. 1994).

**B. <u>Applicable Law</u>**

> *(i)* ***The District Court's limited jurisdiction to enjoin third-party litigation.***

Generally, [t]he filing of a bankruptcy petition creates an estate that is comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The phrase 'all legal or equitable interests of the debtor in property' has been construed broadly, and includes 'rights of action' such as claims based on state or federal law." *Highland Capital, supra., (citing Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.),* 714 F.2d 1266, 1274 (5th Cir. 1983). "If a claim belongs

to the estate, then the bankruptcy trustee has exclusive standing to assert it." *Highland Capital,* supra*., (citing In re Educators Group Health Trust*, 25 F.3d at 1284. "However, the trustee has no right to bring claims that belong solely to the estate's creditors." *Highland Capital, supra., (citing Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S. Ct. 1678, 32 L. Ed. 2d 195 (1972).

"Whether a particular state-law claim belongs to the bankruptcy estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case." *Highland Capital,* supra*,* (citing *In re Educators Group Health Trust*, 25 F.3d at 1284. "As part of this inquiry, [the Courts] look to the nature of the injury for which relief is sought and consider the relationship between the debtor and the injury." *Highland Capital,* supra*., (citing In re Educators Group Health Trust* at 1284-85; *see In re E.F. Hutton Sw. Props. II, Ltd.,* 103 B.R. 808, 812 (Bankr. N.D. Tex. 1989) ("The injury characterization analysis should be considered as an inseparable component of whether an action belongs to the [estate] or [creditor].").

Significantly, "[i]f a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate." *In re Educators Group Health Trust*, 25 F.3d at 1284 (citations omitted). "Conversely, if the cause of action does not explicitly or implicitly allege

harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate." *Id.*

Put another way, the "**controversy is primarily a question of jurisdiction**." *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52 (2nd Cir. 2008) (emphasis added) (holding that "the bedrock jurisdictional issue in this case requires a determination as to whether the bankruptcy court had jurisdiction over the disputed statutory and common law claims.") (reversed on procedural grounds, *see Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 129 S. Ct. 2195, 174 L. Ed. 2d 99 (2009)). Also, "[w]hether the rights belong to the debtor or the individual creditors is a question of state law." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2nd Cir. 1995) (citing *St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.,* 884 F.2d 688, 700 (2d Cir. 1989).

In this process, it is instrumental to keep in mind that "[w]hen creditors […] have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim…" *Hirsch,* supra. "…**[T]he existence of common parties and shared facts between the bankruptcy and the bondholders' suit does not necessarily mean that the claims asserted by the bondholders are property of the estate**." *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.*), 522 F.3d 575 (5th Cir. 2008) (emphasis added). "**Indeed, […] it is entirely possible for a bankruptcy estate and a creditor to own separate**

**claims against a third party arising out of the same general series of events and broad course of conduct**." Id (emphasis added) (citing *Schertz-Cibolo-Universal City, Indep. School District v. Wright (In re Educators Group Health Trust),* 25 F.3d 1281, 1285 (5th Cir. 1994). See also *Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746, 753 (5th Cir. 1995) ("Shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action 'related to' the bankruptcy [for purposes of finding bankruptcy jurisdiction].").

>        *(ii)    UBS' breach of its "highest fiduciary duty" under PRUSA is
>                actionable as an Article 1802 damages claim.*

The Commonwealth Action expressly incorporates and underscores UBS' "highest fiduciary duty" under PRUSA towards Plaintiffs-Appellants as investors in the ERS. See App. 769 at ¶ 4.68. Under Section 25.1 of PRUSA's Regulation,

> "**[e]very broker-dealer**, issuer, **investment adviser**, investment adviser representative, federal covered adviser, investment adviser representative of a federal covered adviser, agent or any other person subject to the provisions of the Act, **must observe the highest standard of fiduciary duty toward** their customers **and investors**…."

Regulation 6078 of January 19, 2000, of the Office of Commissioner of Financial Institutions of Puerto Rico, issued pursuant to 10 PR Laws Ann. §§851, et seq., Section 25.1. Standard of business and fiduciary duties toward customers. (Emphasis added).

Plaintiff-Appellants' Commonwealth Action is based on Article 1802 of the

Puerto Rico Civil Code of 1930, as amended, P.R. Laws Ann. tit. 31, § 5141, Puerto Rico's general tort statute. Said statute has a dual role and can serve as a procedural mechanism to prosecute the damages caused by UBS by breaching its substantive fiduciary duty under PRUSA, as well as to enforce Article 1802's own general duty of care.

Article 1802 establishes that "[a] person who by act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141. It further provides that "[c]oncurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity." Id. For a cause of action to prosper under Art. 1802, supra, three elements must be present, namely: (1) a culpable or negligent act or omission; (2) causal relationship between the culpable or negligent act or omission and the damage being claimed, and (3) an actual damage. *Nieves Diaz v. González Massas*, 178 DPR 820, 843 (2010); *López v. Porrata Doria*, 169 DPR 135, 150 (2006). No contractual relationship between plaintiffs and defendants is required.

As for the first element, "the concept of fault… is as infinitely broad as the conduct of human beings and includes any fault of a person that produces harm or damages." *Lopez v. Porrata Doria*, supra, p. 150. Likewise, the concepts of fault and negligence are equivalent to non-compliance with the duty of care. This, in turn, consists of not anticipating or foreseeing the likely consequences of one's acts,

which would have been foreseen by a prudent and reasonable person. *Nieves Diaz v. González Massas*, supra, p. 844; *Lopez v. Porrata Doria*, supra, p. 151; *Valle v. E.L.A.*, 157 DPR 1, 18 (2002); *Ramos v. Carlo*, 85 DPR 353, 358 (1962).

This general duty of care does not require a person to precisely imagine all the potential consequences that may arise from a certain conduct. *Pons v. Engebretson*, 160 DPR 347, 355 (2003). "The essential thing is that there is a duty to foresee, in a general way, the consequences of a certain class." Id. Therefore, if the damage caused was foreseeable, there will be liability; if it was not, it will be considered a fortuitous event. *Pons v. Engebretson*, supra. Lastly, the duty of care and to foresee possible damages does not extend to any imaginable danger that could cause damage, but rather must be based on probabilities, not mere possibilities. *Lopez v. Porrata Doria*, supra, pp. 164-165.

On the other hand, the second element requires that there be a causal link between the damage caused and the culpable or negligent act or omission, that is, adequate cause. The theory of adequate cause provides that "not every condition without which the result would not have been produced is a cause, but the one that ordinarily produces it according to general experience." *Colon Santos v. Coop. Sec. Mult. PR*, 173 DPR 170, 186 (2008). That is, "damage may be considered the probable and natural result of a negligent act or omission if after the event, in retrospect, the damage appears to be the reasonable and common consequence of the

act or omission." *Pons v. Engebretson*, <u>supra</u>, pp. 355-356; *Hernández Vélez v. Televicentro*, 168 DPR 803, 815 (2006). To that effect, the Supreme Court of Puerto Rico has held that "[t]he doctrine of adequate causality requires indices or criteria based on experience and knowledge of causes and effects to give it content." *Lopez v. Porrata Doria*, <u>supra</u>, pp. 166-67.

Lastly, for a cause of action under Article1802, <u>supra</u>, to prosper in our legal system, it is necessary that a damage occurs. That is, "any material or moral impairment caused in contravention of a legal norm, suffered by one person and for which another has to respond." J. Puig Brutau, Fundamentals of Civil Law, Barcelona, Ed. Bosch, 1983, T. 2, Vol. 3, p. 92. <u>See also</u> *Sagardía De Jesús v. Hospital Aux. Mutuo*, 177 DPR 484, 505 (2009). In the absence of a damage, there is no obligation to indemnify. *Lopez v. Porrata Doria*, <u>supra</u>, p. 151.

## C. <u>Discussion of Error</u>

For over 11 years and prior to PROMESA's enactment, Plaintiffs-Appellants, in their capacity as investors, have prosecuted the Commonwealth Action. The gist of their claim is two-fold. First, the ERS, as co-plaintiff, <u>was</u> pursuing a contractual cause of action against UBS, for its role as underwriter of the $3 Billion POBs that proved to be disastrous for the ERS' viability as a non-profit trust.[4] Second, the

---

[4] The ERS is not contesting the District Court's decision. Their claim, which was contractual in nature, will now be pursued by the Avoidance Action Trustee.

Commonwealth Action additionally pursues a separate cause of action on behalf of Plaintiffs-Appellants for damages under Article 1802 of Puerto Rico's 1930 Civil Code. Plaintiffs-Appellants have no interest in the first count, which had been pursued by the ERS since 2017. Their interest is exclusively focused on their individual claims as *investors* in the ERS who relied on UBS' investment advise.

This case is atypical in the sense that UBS filled conflicting roles concerning the POBs, since it has historically operated in Puerto Rico as (i) a broker-dealer, (ii) an investment advisor, and (iii) an underwriter. With time, the lines separating these functions have become less apparent, causing confusion among the Puerto Rico investor community and the courts. Despite these increasingly blurred lines, UBS reaped over $35 million in fees by facilitating the issuance of the POBs. In the process, it turned a blind eye to the clear red flags indicating that such issuance was detrimental to the ERS and, as relevant here, to Plaintiffs-Appellants' personal interests in their hard-earned retirement funds.

Indeed, the FAC details how UBS, behind its prestigious name and stature, signed off on a massive issuance of $3 Billion in POBs that it knew or should have known was not going to help the ERS nor Plaintiffs-Appellants' personal investments. The POBs were issued with the goal of providing liquidity to the ERS and a positive arbitrage from the ERS's investment of these funds. App. 751 (at ¶ 4.1) and App. 766 (at ¶ 4.56). But the size of the issuance was inadequate and only

served to create an additional burden on the ERS. App. 758 (at ¶ 4.52) and 766-767 at ¶ 4.56)

Considering that the issuance would inject far too little liquidity into the system, UBS should have alerted all persons affected by the issuance of the POBs, including Plaintiffs-Appellants, of the inherent risks behind such risky investment decision or refrain from continuing with said bond issuance, just like its counterpart Merill Lynch had previously done. Id at App. 767 (at ¶ 4.58). As a key participant in a highly regulated industry, subject to the *uberrima fides* standard, UBS is personally and directly responsible to the Plaintiffs-Appellants for its conduct to the detriment of their investment.

In its Opinion and Order, the District Court overlooked these intricacies, placing an undue emphasis on the contractual nature of UBS' relationship with the ERS itself. The District Court framed the issue as one of a complaint (i) "devoid of any allegations of direct contact between UBS and the ERS Beneficiaries, individually…" App. 1346, (ii) "assert[ing] four causes of action arising from contractual relations between UBS and ERS", Id., and (iii) "claim[ing] against UBS based on UBS' alleged breach of contractual obligations and fiduciary duties owed to ERS." App. 1347. This description of the FAC's scope and extent and the allegations put forth by Plaintiffs-Appellants is erroneous for various reasons.

i.  **The District Court erred in disregarding UBS' direct duty towards Plaintiffs-Appellants under PRUSA's highest fiduciary duty and Article 1802.**

Unarguably, the Commonwealth Action puts front and center the controversy revolving around UBS' role in the issuance of the POBs, both in its capacity as an underwriter and in its separate capacity as an investment advisor. App. 769 at ¶ 4.67 ("UBS, as Financial Advisor, should have been aware of this market deterioration and should have alerted the members of the System's Board of Trustees and make the corresponding recommendation"). The FAC further highlights how UBS is subject to a heightened fiduciary standard, pursuant to PRUSA's regulations. App. 769 (¶¶ 4.68 and 4.69). And how that *uberrima fides* standard is not only owed towards customers (such as the ERS) but also towards investors (such as Plaintiffs-Appellants). Id.

Pressed by the District Court on this issue during oral argument, Plaintiffs-Appellants explained that the duty of care owed by UBS towards them resulted from their capacity as beneficiaries of the ERS. Put differently, **as investors placing their funds in the hands of UBS as an investment advisor to the ERS, Plaintiffs-Appellants were also entitled to a duty of care from UBS**, separate and distinct from any contractual duty (or otherwise) owed by UBS to the ERS itself. See *Asociación de Enfermería Visitante Auffant, Inc. v. Great-West Life & Annuity Ins.*

25

*Co.,* 775 F. Supp. 2d 333 (D.PR 2010)[5] (holding that a PRUSA claim, in the context of registration, licensing and reporting requirements, *"***seeks a remedy for just such an independent legal duty***"* as opposed to a duty under ERISA). Yet, despite Plaintiffs-Appellants repeated efforts to highlight UBS' separate duty towards them because of their status as investors, the District Court failed to see the distinction.

The following exchange illustrates how the District Court misconstrued the relevant issues at hand. As the Honorable Court will notice, the District Court correctly pointed out that there had to be a duty of care to activate a general tort cause of action. But it failed to see that UBS, as an investment advisor, in a highly regulated securities industry subject to the "highest standard of fiduciary duty", owed a duty towards the Plaintiffs-Appellants directly. Instead, the District Court focused exclusively on the contractual relationship between UBS and ERS and mistakenly concluded that Plaintiffs-Appellants' claims in the Commonwealth Action flowed from those contractual claims by the ERS, as a secondary harm. This is incorrect. There is no dotted or indirect line between UBS' conduct and Plaintiffs-Appellants' damages. The damages sought are a direct result of UBS' independent breach of its good faith, fair dealing and highest fiduciary duties towards Plaintiffs-

---

[5] Opinion issued by Magistrate Judge Bruce J. McGiverin with the parties' consent.

Appellants. The exchange between the District Court and Plaintiffs-Appellants went as follows.

> THE COURT: Because ERS was crippled, and now there's a plan that's changed it, **but they never had a direct relationship with UBS**. UBS wasn't investing their individual money. So how is their claim against UBS any different from saying, UBS, you hurt -- you crippled, you rendered dysfunctional the entity that owed me money?

> MR. VICENTE-COLON: It is, Your Honor, by nature of Article 1802. They're not -- **it does not need to have privy of contract. It's an extra-contractual cause of action**.

> THE COURT: But 1802 has been construed to you just embody a traditional tort cause of action. For a traditional tort cause of action, **you need to have a duty to the person who is suing**. **That person who is suing needs to show that there's a duty -- that person who was suing needs to show there is a breach of that duty to that person and that that person was damaged by the breach**. **And here we have a relationship between UBS and ERS, not a direct relationship with the beneficiaries**, and I haven't heard you talk about a duty that UBS had to the beneficiaries individually.

> MR. VICENTE-COLON: **Well, the beneficiaries are also always the ultimate beneficiaries of the plan, so I think there's a thin line on the duty aspect**, Your Honor. However, I do not agree with the interpretation of Article 1802. If a person acts negligently and that negligence causes damages, it doesn't matter if it's a direct or -- a direct damage or a third party. It is still an action -- it's actionable under 1802.

> THE COURT: **But a negligence cause of action requires a duty of care to the plaintiff**, so where's the direct duty of care to the plaintiff?

> MR. VICENTE-COLON: **Because they're the beneficiaries**, they are the –

> THE COURT: **Of a contract with somebody else**?

MR. VICENTE-COLON: **No. Of the plan**, Your Honor.

App. 1287-88 (emphasis added).

As can be gleaned from the above, the District Court equated Plaintiffs-Appellants' status as that *of beneficiaries of a contract with somebody else*. In other words, the District Court did not see any additional avenue that could be used by Plaintiffs-Appellants to bring a cause of action directly against UBS. To be fair, this interpretation may be correct in the context of a regular contractual relationship **falling outside of the securities realm**. The same analysis may hold true in the context of a *caveat emptor* system, where the buyer alone is responsible for confirming the suitability of the goods acquired. But Puerto Rico's *BlueSky's* laws, under PRUSA and pursuant to important public policy considerations, have expressly implemented a stricter standard of care, which UBS knew or should have known.

Under PRUSA's regulations, "**[e]very broker-dealer**, issuer, **investment adviser**, investment adviser representative, federal covered adviser, investment adviser representative of a federal covered adviser, agent or any other person subject to the provisions of the Act, **must observe the highest standard of fiduciary duty toward their customers <u>and investors</u>**…." (Emphasis and underlined ours) Regulation 6078 of January 19, 2000, of the Office of Commissioner of Financial Institutions of Puerto Rico, issued pursuant to 10 PR Laws Ann. §§851, <u>et seq.</u>,

Section 25.1. Standard of business and fiduciary duties toward customers.

Noticeably, PRUSA's regulations impose a much stricter and independent duty towards customers *but also towards <u>investors</u>*. If a contractual relationship was needed as a precondition to activate this duty, as reasoned by the District Court, then the regulation would have simply referred to customers, excluding the word "investors." In other words, under this limited reading of the regulation, the express reference to investors would be superfluous. "A statute, however, ought to be construed in a way that 'no clause, sentence, or word shall be superfluous, void, or insignificant.'" *Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1 (1st Cir. 2022) (citations omitted). As this Honorable Court recently expressed in *Consumer Data*, <u>supra</u>, a construction of a statute in this way is "contrary to the well-known canon that, if possible, 'every word and every provision' in a statute is to be given effect, none should be ignored, and none should be given an interpretation that causes it to have no consequence." <u>Id</u> (citing Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 174 (2012)).

Further, in the recent Robinhood Financial LLC case, the Supreme Judicial Court of Massachusetts issued a seminal decision addressing the far-reaching effects of a strict fiduciary standard, such as the one contemplated under PRUSA. The case was decided just weeks ago. <u>See</u>, *Robinhood Financial, LLC v. Secretary of the Commonwealth*, 492 Mass. 696 (August 25, 2023) (Slip Opinion).

Robinhood, an internet-based platform facilitating retail trades by investors, was recently thrust into the national limelight due to the "meme stock" frenzy that gained notoriety when the stock of failing companies, like GameStop, skyrocketed in price. Due to a surge in interest for these stocks, investors mostly relied on Robinhood's platform to purchase these securities and drive prices up, to make institutional investors that were betting against (or "shorting") the stock realize significant losses.

The Secretary of the Commonwealth of Massachusetts (the "Secretary") accused Robinhood "of taking advantage of unsophisticated investors to fill its own coffers by dispensing ill-suited investment advice to these customers and by encouraging them to engage in risky trading practices using its online trading platform." Id a p. 2. Said conduct, allegedly "…violated the prohibition of the Massachusetts Uniform Securities Act, G. L. c. 110A (MUSA), against "unethical or dishonest conduct or practices in the securities, commodities[,] or insurance business," G. L. c. 110A, § 204 (a) (2) (G) -- a phrase that the Secretary has defined to require broker-dealers that provide investment advice to retail customers to comply with a statutorily defined fiduciary duty." Id at p. 2-3.

But "[u]nlike prior standards of care, which differentiated between broker-dealers and investment advisers in view of their traditionally distinct investment services and offerings, the rule brings the fiduciary obligations of broker-dealers in

line with those of investment advisers, making uniform the duties owed by those engaged in the business of providing investment advice regardless of label." Id. That duty requires "a broker-dealer or agent to use the care, skill, prudence, and diligence that a person acting in a like capacity and familiar with such matters would use, taking into consideration all of the relevant facts and circumstances." 22 950 Code Mass. Regs. § 12.207(2)(a). This includes "[d]isclos[ing] all material conflicts of interest", *inter alia*. Id.

The main issue in *Robinhood*, "concern[ed] the question whether, by promulgating the fiduciary duty rule, the Secretary overstepped the bounds of the authority granted to him under MUSA." Id at p. 3. Moreover, "the Secretary alleged that Robinhood provided investment recommendations to its Internet-based customers without considering whether those recommendations were in each customer's best interest…" Id at pp. 4-5. **Significantly, the Secretary claimed that Robinhood's conduct** of encouraging 'frequent, risky, and unsuitable trading' by '[i]nexperienced [i]nvestors,' by publishing investment categories like "100 Most Popular" or "Top Movers," **was tantamount to direct investment recommendations to customers that were actionable under Massachusetts BlueSky laws**. Id at footnote 5.

In its defense, Robinhood maintained "that, as a 'self-directed' brokerage firm, it does not make investment recommendations or provide investment advice."

Id at p. 5. In other words, it merely serves as a facilitator of trades, with no direct interactions with the investors using its platform. And with no contractual responsibility as an advisor to the retail investors.

As relevant here, however, the Court in *Robinhood*, referring to the strict fiduciary standards **imposed in at least four other states**,[6] ruled in favor of the Secretary and his theory that Robinhood's course of conduct was tantamount to investment recommendations that were actionable. The ramifications of this case remain to be seen and are the result of strict statutory mandates, sending a message to firms seeking to mirror UBS' conduct as related to the Plaintiff-Appellants. Unarguably the case should help to clarify that in strict fiduciary duty jurisdictions, like Puerto Rico, the lack of contractual relationship in the context of the securities industry does not foreclose an action in favor of an investor. In sum, an entity like UBS, who is highly regulated and holds different roles, such as those of a broker-dealer and an investment advisor, can be held accountable for its conduct in cases where it sends a deceitful message to investors.

Here, with its endorsement of a massive issuance of $3 billion in POBs, **UBS sent a loud (yet conflicting) message to the investors** in the ERS: that the system

---

[6] These include California, Missouri, South Carolina, and South Dakota. Although not mentioned, it is undisputed that Puerto Rico should also be part of this list, as it incorporated a strict fiduciary standard into PRUSA, as discussed above.

was fiscally sound and strong enough to support a bond issuance with a long-term maturity. Yet, as alleged in the FAC, that decision was ill-advised and put the ERS and Plaintiffs-Appellants' retirement investments in a deeper hole. Plaintiffs-Appellants were entitled to know if their investments in the ERS continued to make sense, to make important decisions, such as directly objecting with the ERS about the wisdom of such investment decision, *inter alia*. UBS' conduct not only harmed the ERS itself, but inflicted foreseeable damages upon the ERS beneficiaries, for which they have not been compensated. Such damages consist, *inter alia*, of the Plaintiffs-Appellants losing part of their pensions, including the cost-of-living adjustments, higher age criteria to qualify for pensions, loss of their marginal benefit to take loans originated by the ERS, as well as the mental anguish and suffering which any human being can be expected to suffer after seeing their life savings evaporate.

These legal theories are aligned with the allegations posited in the FAC by the Plaintiffs-Appellants, which should continue their course before the Puerto Rico state courts.

ii. **The District Court erred by placing undue weight on the purported need to have allegations of "direct contact between UBS and the ERS Beneficiaries individually" for Plaintiffs-Appellants to posit a direct claim against UBS.**

The District Court determined that "[t]he FAC is devoid of any allegations of **direct contact** between UBS and the ERS Beneficiaries, individually, or of any specific effect of UBS' allegedly wrongful conduct toward ERS and the ERS Beneficiaries' pension benefits. Rather, the FAC asserts four causes of action arising from contractual relations between UBS and ERS." App 1346. The District Court overlooked what investment advice really is and consequently ignored longstanding doctrines applicable in the securities industry, which are equally actionable under an all-encompassing tort statute as Article 1802.

The Supreme Court of the United States has stated that "[c]onduct itself can be deceptive" and liability under the federal securities law's antifraud provisions does not require "a specific oral or written statement." *Stonebridge Inv. Partners, LLC v. Scientific Atlanta*, 552 U.S. 148, 158 (2008). See also *SEC v. Dorozhko,* 574 F.3d 42, 50 (2d Cir. 2009) (stating that "[i]n its ordinary meaning, 'deceptive' covers a wide spectrum of conduct involving cheating or trading in falsehoods").

As the Supreme Court clarified in *The Wharf (Holdings) Ltd. V. United Int'l Holdings, Inc*., 532 U.S. 588, 596-597 (2001), conduct alone can be deceptive because conduct encompasses implied representations. Whether conduct is

deceptive depends mostly on context. See *Accord United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008). Cases under the federal securities laws' anti-fraud provisions, which are analogous to PRUSA's provisions, have dealt with a variety of misleading conduct not accompanied by direct statements. See *United States v. O'Hagan*, 521 U.S. 642, 655 (1997) (a fiduciary's misappropriation of confidential information from the source of the information who understood there was fidelity among the parties); *Accord United States v. Finnerty*, 533 F.3d at 48-89 (dealing with computer hacking).

Indeed, the Supreme Court has even recognized that federal securities laws should be construed "cumulatively". *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382-383 (1983). That is, it should not be "neither unusual nor unfortunate" that there is overlap between provisions because such overlap "furthers [the] broad remedial purposes" behind the statutory scheme. Id. Indeed, PRUSA follows a similar path. See 10 PR Laws Ann. §890h ("The rights and remedies provided by this chapter are in addition to any other rights or remedies that may exist at law…"). See also *Mendez Moll v. AXA Equitable Life Ins. Co.*, 202 DPR 630 (2019) (Judgment) (*Mendez Moll's* concurring opinion by Justices Pabón Charneco, Kolthoff Caraballo, Rivera García and Estrella Martínez recognizes the existence and validity of a separate civil cause of action in cases where the seller of a financial product violates some fiduciary duty, rule or industry regulation.)

The same liability principles hold true in the context of broker-dealers, who are generally not subject to the heightened fiduciary standards imposed on Investment Advisors. More than 70 years ago the Securities and Exchange Commission in *Duker & Duker*, 6 S.E.C. 386, 388 & n. 5 (1939) held that by conducting business as a broker-dealer, a firm makes the implied representation that will treat customers and other broker-dealers fairly. That implied representation, consequently, is broken when the broker-dealer engages in acts that are inconsistent with the same. This is also known as the "shingle" theory.[7] "Consistent with this high ethical standard to which broker-dealers are held, the commission and the courts long ago adopted the "shingle" theory. When a broker-dealer hangs out a professional shingle it impliedly represents that it will deal with customers thoroughly, honestly and in accordance with industry standards." *SEC v. Great Lakes Equities Co*., 1990 U.S. Dist. LEXIS 19819 *; Fed. Sec. L. Rep. (CCH) P95,685 (E.D. Mich 1990). As such, "[i]nvestors rely on this implied representation of fair dealing and, accordingly, are deceived within the meaning of the anti-fraud provisions by undisclosed conduct which is inconsistent with that representation. Id

---

[7] We are unaware of any First Circuit decisions rejecting the SEC's longstanding interpretation that conduct be actionable under the securities laws. *Cf* with *SEC v. Tambone*, 597 F.3d 436 (1st Cir. 2010), where the First Circuit considered whether a securities professional violated the federal securities laws by selling securities using untrue statements contained in a prospectus prepared by others. Here, however, the Commonwealth Action focuses on UBS' own conduct.

(citing *Charles Hughes & Co. v. Securities & Exchange Com.,* 139 F.2d 434, 437 (2d Cir. 1943*), cert denied 321 U.S. 786 (1944).*)

As the above cited principles show, **a securities law action –and by extension a tort action under Puerto Rico's general tort statute— may be anchored on certain conduct which has the effect of deceiving a reasonable investor**. This goes to the core of Plaintiffs-Appellants' legal theory in the Commonwealth Action.[8] When UBS gave its seal of approval to the ERS' $3 billion bond issuance with a long-term maturity, it was impliedly telling the investors, like Plaintiffs-Appellants, that the system and their invested funds were not in immediate danger of collapsing. We now know, however, that this was totally wrong since the POB issuance worsened the ERS' position and Plaintiffs-Appellants' underlying investments in the system. By focusing instead on the existence of allegations of "direct contact" between UBS and Plaintiffs-Appellants and rejecting a liability theory based on UBS' conduct, the District Court analyzed the controversy through a harsher (and incorrect) pleading standard.

---

[8] Whether the claims will ultimately prove to be legally or factually valid is a concern of the Puerto Rico state courts. See *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.*), 522 F.3d 575, 585 (5th Cir. 2008)

### iii. The District Court erred by focusing its decision on inapposite Second Circuit case law which has been questioned by that same Circuit Court of Appeals.

In ruling that Plaintiffs-Appellants' claim was a general one, with no particularized injury, the District Court placed significant emphasis on the Second Circuit's decision in *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688 (2d Cir. 1989). App. 1346. ("As in St. Paul, the ERS Beneficiaries only articulate a generalized injury –anticipated diminution of retirement benefits as a result of ERS' financial condition"). Yet, the Second Circuit itself has limited and distinguished St. Paul's holding. Tellingly, subsequent analogous Second Circuit decisions omitted by the District Court, have reached significantly different results.

To start, "St. Paul decided the 'specific question' whether a creditor may bring an alter ego claim against the debtor's parent when the debtor itself also possesses such a claim." *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013). The claims brought in St. Paul vis-à-vis the claims raised here are as different as day and night. Plaintiffs-Appellants are not pursuing any alter ego claims. Nor are they pursuing claims against the parent company of a bankrupt debtor. Their claims are aimed at a third party (UBS) that must adhere to a strict fiduciary duty standard that can be actionable by investors relying on UBS' conduct.

Conversely, the Commonwealth Action is more aligned with *Picard v. JPMorgan Chase,* supra. There, Irving Picard, in his capacity as Trustee, filed an action under the Securities Investor Protection Act ("SIPA") on behalf of victims in the Bernard Madoff infamous Ponzi scheme. Picard pursued four actions alleging that numerous major financial institutions *that serviced* Madoff's brokerage firm, such as JP Morgan Chase and UBS AG, aided and abetted the fraud, collecting steep fees while ignoring blatant warning signs. "In summary, the complaints allege that, when the Defendants were confronted with evidence of Madoff's illegitimate scheme, their banking fees gave incentive to look away, or at least caused a failure to perform due diligence that would have revealed the fraud." Id.

Relying on the Supreme Court's decision in *Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416, 92 S. Ct. 1678, 32 L. Ed. 2d 195 (1972), the Second Circuit underscored how "'[n]owhere in the statutory scheme is there any suggestion that the trustee in reorganization is to assume the responsibility of suing third parties' on behalf of creditors." Id at 428. It also highlighted the various policy considerations favoring that creditors, such as Plaintiffs-Appellants, continue to move forward with their claims against entities that had served a debtor: (i) "[t]his way, creditors can 'make their own assessment of the respective advantages and disadvantages, not only of litigation, but of various theories of litigation," Id. at 431; (ii) "no consensus is needed as to 'the amount of damages to seek, or even on the

theory on which to sue,'" Id. at 432; and (iii) "disputes over inconsistent judgments and the scope of settlements can be avoided."

This rationale is consistent with a string of Second Circuit decisions dismissing claims brought by Trustees against service providers of a bankrupt debtor. This view, as opposed to that in *St. Paul*, is the leading view in the Second Circuit in cases analogous to the Commonwealth Action. See *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1094 (2d Cir. 1995) (finding that a trustee lacked standing to bring creditor claims against accountants and law firms that had serviced a real estate partnership operated as a Ponzi scheme); *The Mediators, Inc. v. Manney (In re Mediators, Inc.),* 105 F.3d 822, 826 (2d Cir. 1997) (affirming dismissal of breach of fiduciary duty claim brought by creditors' committee functioning as bankruptcy trustee, against bank and law firm for allegedly aiding and abetting debtor's fraud); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir. 1991) (dismissing the trustee's claim against a brokerage firm for effecting stock transactions that facilitated a misappropriation of funds by the owner and president of the debtor company); *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52 (2nd Cir. 2008) (reversed on procedural grounds) (allowing third party claims to continue their course against debtor's insurance company for its own alleged misconduct separate from its contractual obligation to indemnify the debtor's misconduct.)

The logic employed in *Manville* (which included a panel composed by then Circuit Judge Sonia Sotomayor) is also instructive here. There, Travelers, an insurer for Manville, a leading manufacturer of asbestos-containing products, tried to enjoin multiple tort cases by individuals who were exposed to Manville's asbestos. These plaintiffs claimed that since the 1950s Travelers had acquired firsthand knowledge of the dangers of asbestos and despite this knowledge Travelers influenced Manville's purported failure to disclose its knowledge of asbestos hazards. In other words, these suits focused on Travelers' own wrongdoing as opposed to Travelers' role as Marville's insurer.

The lower courts, similar to the District Court here, determined that these suits sought "*indirect* recovery from the proceeds of the insurance policies [issued by Travelers] as a result of personal injuries caused by Manville products." Id. at p. 62. They further emphasized that although these plaintiffs argued that their injuries were separate and independent from those incurred from asbestos exposure, each had experienced personal injury from some form of asbestos exposure. As such, the lower courts opined that these suits (i) affected the "property of the estate" because they sought direct recovery authorized by state statutes from Travelers' insurance policies, and (ii) were inconsistent with "global finality . . . as a necessary condition for [Travelers] to make a significant contribution to the Manville estate." Id at p. 57.

Characterizing these determinations as "only half of the equation," the Circuit Court disagreed. Instead, it held that "[t]he nature and extent of Travelers' duty to the Direct Action plaintiffs is a function of state law. Neither court looked to the laws of the states where the claims arose to determine if indeed Travelers did have an independent legal duty in its dealing with plaintiffs, notwithstanding the factual background in which the duty arose." Id at p. 63. It further reasoned that:

> [t]here is no doubt that these findings by the bankruptcy court document the *factual* origins of Travelers' alleged malfeasance. The factual findings are, however, only part of the liability equation. **What remained was a legal determination: did Travelers owe a duty to the Direct Action Plaintiffs independent of its contractual obligations to indemnify those injured by the tortious conduct of Manville? If such a duty exists, then the fact that it arises from a common nucleus of operative facts involving Travelers and Manville (*e.g.*, the Manville / Travelers insurance relationship) is of little significance from a jurisdictional standpoint.** As noted above, drawing the duty line is a function of state and not federal law.

Id. at p. 67. (Emphasis added).

Unlike the Second Circuit in *Malvine*, the District Court placed undue weight on the nucleus of operative facts involving the POB issuance and the fact that Plaintiffs-Appellants' damages were mostly tied to their benefits in the ERS. The key question, however, was whether UBS owed them a separate duty, which it did under PRUSA's regulations and Article 1802's general duty of care.

Finally, it bears mentioning that the Second Circuit is not alone in employing this analysis. The Fifth Circuit has also followed suit. In *Highland Capital Mgmt.*

*LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.*), 522 F.3d 575 (5th Cir. 2008), a group of investment funds (the "bondholders"), that held $30 million in unsecured notes issued by Seven Seas Petroleum, Inc., filed suit against Ryder Scott Company for its role in providing certain reserve estimates to Seven Seas. Seven Seas, a company that explored and developed oil and gas properties and that was forced into bankruptcy, had engaged Ryder Scott Company, a reservoir-evaluation consulting firm, to provide reserve estimates calculated in accordance with the Securities Exchange Commission's "proved reserves" guidelines. These reserve estimates were incorporated into Seven Seas' annual reports and were also important because Seven Seas' ability to issue secured debt--which would be senior to the unsecured notes held by the bondholders--was tied to the reserve estimates.

Robert A. Hefner, III, the chairman and CEO of Seven Seas, led a group of investors that purchased half of the secured notes. The other half was purchased by Chesapeake Energy Corporation, which also sued under an aiding and abetting theory. The Bondholders alleged that "Hefner and the directors knew that Seven Seas was insolvent or of questionable solvency and arranged to provide additional financing […] on terms that were highly advantageous for the holders of the secured notes but detrimental to the company and its other creditors." Id at p. 580. Significantly and even though there was no "direct contact" or contractual privity, as in the present case, "**the bondholders alleged that Ryder Scott owed them a**

**duty to use reasonable care in calculating the reserve estimates**…" Id. That is, a group of individual investors (like Plaintiffs-Appellants), filed suit against an entity that serviced a debtor (like UBS), claiming that said third party regardless of a direct relationship still owed them a fiduciary duty.

Like UBS in the present case, who harped on how issuance of the POBs contributed to the ERS' subsequent depletion, the defendants argued **"that the harm complained of by the bondholders is strictly derivative or indirect because the issuance of the secured notes […] were acts that contributed to Seven Seas' subsequent lack of assets to repay its creditors**." Id at p. 585 (Emphasis added).

But the Fifth Circuit disagreed with this limited view, reasoning that:

> …the bondholders and Chesapeake are linked in a variety of ways to Seven Seas and the bankruptcy proceeding. Both Chesapeake and the bondholders are creditors of Seven Seas, and **the bondholders' claims against Chesapeake ultimately arise from the fact that the bondholders invested in the unsecured notes issued by Seven Seas. However, the existence of common parties and shared facts between the bankruptcy and the bondholders' suit does not necessarily mean that the claims asserted by the bondholders are property of the estate**.

Id. (Emphasis added).

Unlike the District Court's restricted view, the Fifth Circuit determined that "it is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct." Id. Afterall, "the bondholders' claims [like those of Plaintiffs-

Appellants] and the estate's claims are not mutually exclusive: there is nothing illogical or contradictory about saying that Chesapeake [like UBS here] might have inflicted direct injuries on both the bondholders and Seven Seas during the course of dealings that form the backdrop of both sets of claims." Id at p.587. A similar result should take place here.

iv.   **The District Court erred by misconstruing the scope of Act No. 3-2013, a task that also falls under the jurisdiction of the Puerto Rico state courts.**

Act No. 3-2013 grants Plaintiff-Appellants an independent foundation for direct claims against UBS. As the District Court acknowledged in its Opinion & Order, "**[t]he parties agree that Act No. 3-2013 allows ERS, ERS participants, and ERS pensioners to sue** underwriters in connection with ERS' issuance of pension obligation bonds." App. 1419. For unknow reasons, the District Court failed to add that the Act allows the same exact remedies against "investment advisors." Note that it provides as follows:

> Cause for action is hereby recognized to the participants and pensioners of the Employees Retirement System of the Government of Puerto Rico and the Judiciary **to sue**, pro se, nongovernment **investment advisers** and underwriters **in any transaction in which pension obligation bonds have been issued** by the Employees Retirement System of the Government of Puerto Rico and the Judiciary, **for damages caused** to the System **or its beneficiaries**.

See, PR Laws. Ann. Tit. 3 §§ 786-1, *et seq*. (Emphasis added).

That statute was enacted several years before the 2017 filing of PROMESA and the Plan of Adjustment. App. 1420. Further, its clear language recognized a cause of action to the participants and pensioners of the ERS to sue, **nongovernment investment advisers (UBS)** in any transaction in which pension obligation bonds have been issued by ERS, for damages caused to its beneficiaries. Again, for unknown reasons the District Court's Opinion & Order avoids mentioning the "investment advisor" portion of the statute.

Further, as previously stated in this Brief, on August 30, 2013, the state court of appeals had already ruled that the Plaintiff-Appellants retained their own separate causes of action under state law against UBS. *See*, Pedro José Nazario v. UBS, KLAN201300738. UBS was a party to that case and did not secure a reversal of that decision by the Puerto Rico Supreme Court. Thus, comity and the Rooker-Feldman doctrine prohibit UBS and the District Court from relitigating the issue.

Note that "[t]he comity doctrine preserves proper federal court respect for state court rulings: There is a strong public policy grounded in the interest of comity between federal and state courts and the notion of federalism, that federal courts should not unnecessarily interfere with state court proceedings." *In re Times Square JV LLC*, 648 B.R. 277, 287 (BK S.D.N.Y. 2023). As to the Rooker-Feldman doctrine, "[a] plaintiff such [as UBS] cannot escape the Rooker-Feldman bar through the

simple expedient of introducing a new legal theory in the federal forum that was not broached in the state courts." *Efreom v. McKee*, 46 F.4th 9, 19 (1ˢᵗ Cir. 2022).

In sum, as has been extensively discussed in this Brief, Plaintiff-Appellants claims in the Commonwealth Action are predicated not "upon [a] secondary harms flowing from UBS' contractual relationship with ERS" as the District Court surmised, but on the violation of UBS' strict fiduciary duty to provide adequate investment advise to the ERS and its investors, who subject to Act 3-2013 have a direct cause of action against UBS.

Further, Article 517 of Act No. 53-2021 provides that an "[a]djustment Plan transactions cannot be used to mitigate causes of action under Act No. 3-2013, as amended." In sum, Article 517 of Act No. 53-2021 protects the Plaintiff-Appellants' right to prosecute any action and recover damages against UBS based in its breach of fiduciary duty, notwithstanding the reorganization of ERS under the terms of the Plan Adjustment because those claims are not derivative of the ERS'. That statute is particularly important in a case such as this one where UBS has attempted to have Plaintiff-Appellants' direct cause of action eliminated because it is slightly related to the ERS case. To avoid that exact scenario is why Act No. 53-2021 was enacted. Notably the District Court took a factual route to exclude their rights and simply stated that the Plaintiff-Appellants' claims are part and parcel of the contractual issue raised by the ERS. This Brief shows the contrary. Further, there is no basis for

simply disregarding state law. Note that "[i]nterpreted in light of standard rules of statutory interpretation, § 506(b) does not supplant state law; rather, it supplements state law." *Ferrari v. Barclays Business Credit*, 87 B.R. 745, 750 (BK Dist. M.A. 1988).

## VIII. <u>CONCLUSION</u>

In sum, the District Court clearly erred and abused its discretion in enjoining Plaintiffs-Appellants from continuing to prosecute their 11-year-old Commonwealth Action. Its decision employed an erroneous view of the law, as explained above, by failing to consider the direct duties owed by UBS to the Plaintiffs-Appellants under Puerto Rico law as investors in the ERS.

**WHEREFORE**, Plaintiffs-Appellants very respectfully request that the District Court's November 29, 2022 Memorandum Opinion and Order Granting the Motion to Enforce the Plan be vacated.

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,633 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point-font.

## CERTIFICATE OF SERVICE

It is hereby certified that today, September 11, 2023, Plaintiffs-Appellants' Opening Brief was filed via the First Circuit's Cm/ECF system, which automatically sends notice of filing to all ECF filers, including Appellee's counsel, **Roberto C. Quiñones-Rivera** and **Paul J. Lockwood**, who are registered as ECF filers.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 11th day of September, 2023.

**/s/Harold D. Vicente**
Harold D. Vicente
U.S.C.A No. 27441
hvicente@vclawpr.com

**/s/Harold D. Vicente Colón**
Harold D. Vicente Colón
U.S.C.A No. 22822
hdvc@vclawpr.com

Vicente & Cuebas
P.O. Box 11609
San Juan, PR 00910-1609
Phone No. (787) 751-8000
Fax No. (787) 756-5250

## INDEX TO ADDENDUM

| Number | Filing Date | Docket Number | Item's Description | Addendum Number |
|--------|-------------|---------------|--------------------|-----------------|
| 1. | 11.29.2022 | 22927 | Memorandum Opinion and Order granting the Motion to Enforce the Plan | Add. 001- Add. 014 |
| 2. | 01.26.2023 | 23399 | Order denying Motion for Reconsideration under Bankruptcy Rule 9023 | Add. 015- Add. 021 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO et al.,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17-BK-3283 (LTS)<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO,<br><br>     Debtor. | PROMESA<br>Title III<br><br>Case No. 17-BK-3566 (LTS) |

MEMORANDUM OPINION AND ORDER GRANTING THE MOTION TO ENFORCE THE PLAN

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**Add. 001**

Before the Court is *UBS Financial Services Incorporated of Puerto Rico's Motion to Enforce the Plan of Adjustment and for Related Injunctive Relief* (Docket Entry No. 21651 in Case No. 17-3283 and Docket Entry No. 1364 in Case No. 17-3566, the "Motion to Enforce the Plan")[2][3] filed by UBS Financial Services Incorporated of Puerto Rico ("UBS").  The Motion to Enforce the Plan seeks to enforce the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico et al.* (Docket Entry No. 19784) (the "Plan") and enjoin Pedro José Nazario Serrano, Joel Rivera Morales, María de Lourdes Gómez Pérez, Héctor Cruz Villanueva, Lourdes Rodríguez, and Luis M. Jordán Rivera, and Juanita Sosa Pérez (collectively, the "ERS Beneficiaries"), and the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), from prosecuting certain claims in the pending action captioned *Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico v. UBS Financial Services Inc. of Puerto Rico*, Civ. No. KAC-2011-1067 (the "Commonwealth Action").  (Mot. ¶¶ 1, 47.)   The Court, which has subject matter jurisdiction of this action pursuant to section 306(a) of PROMESA, 48 U.S.C. § 2166(a), has considered carefully all the parties' submissions,[4] and arguments made in connection with

---

[2]    Unless otherwise noted, all references herein to Docket Entry Nos. are references to Case No. 17-2383.  PROMESA is codified at 48 U.S.C. § 2101 et seq.  References to "PROMESA" section numbers herein are to the uncodified version of the legislation.

[3]    Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion to Enforce the Plan.

[4]    The written submissions comprise the *Consolidated: (1) Reply to Opposition to Motion to Stay and (2) Opposition to Motion to Enforce the Plan of Adjustment* (Docket Entry No. 22175) (the "ERS Ben. Opposition"), filed by the ERS Beneficiaries; *Brief Reply To: Official Committee of Unsecured Creditors Limited Response in Support of UBS Financial Services Incorporated of Puerto Rico's Motion to Enforce the Plan of Adjustment [Docket No. 22186] and to Joinder of the Avoidance Actions Trustee to Official Committee of Unsecured Creditors Limited Response in Support of UBS Financial Services Incorporated of Puerto Rico's Motion to Enforce the Plan of Adjustment [Docket No. 22187]* (Docket Entry No. 22199) (the "ERS Ben. Joinder Opp."), filed by the ERS Beneficiaries; *Official Committee of Unsecured Creditors*

the Motion to Enforce the Plan.  For the following reasons the Motion to Enforce the Plan is

granted.

I.

BACKGROUND

A.   The Commonwealth Action

On September 29, 2011, the ERS Beneficiaries filed a complaint initiating the

Commonwealth Action, which seeks to recover damages from UBS based on its role as financial

advisor to ERS in connection with the ERS' issuance of certain pension obligations bonds in

2008. (Mot. ¶ 8.)  The ERS Beneficiaries filed three superseding amended complaints.  Id.  On

April 17, 2019, the ERS Beneficiaries and ERS jointly filed a Fourth Amended Complaint.

(Mot. Ex. A.) (the "FAC").  The FAC asserts five causes of action:  (i) "violation of contractual

duties by UBS and UBS Consulting" (FAC ¶¶ 6.1-6.23); (ii) violations of "section 1802 of the

Puerto Rico Civil Code /UBS and UBS Consulting" (FAC ¶¶ 7.1-7.2); (iii) "liability of insurer

ABC Insurance Company Inc." (FAC ¶¶ 8.1-8.3); (iv) liability of defendant XYZ Insurance

Company Inc. (FAC ¶¶ 9.1-9.2); and (v) "costs and expenses of attorney's fees" (FAC ¶¶ 10.1-

10.2).

---

*Limited Response in Support of UBS Financial Services Incorporated of Puerto Rico's
Motion to Enforce the Plan of Adjustment* (Docket Entry No. 22186) (the "UCC
Response"), filed by the Official Committee of Unsecured Creditors; *Joinder of the
Avoidance Actions Trustee to Official Committee of Unsecured Creditors Limited
Response in Support of UBS Financial Services Incorporated of Puerto Rico's Motion to
Enforce the Plan of Adjustment* (Docket Entry No. 22187) (the "AA Joinder"), filed by
Drivetrain, LLC ("Avoidance Actions Trustee"), in its capacity as the trustee of the
Commonwealth Avoidance Actions Trust; *UBS Financial Services Incorporated of
Puerto Rico's Reply in Further Support of its Motion to Enforce the Plan of Adjustment
and for Related Injunctive Relief* (Docket Entry No. 22274) (the "UBS Reply"); and *Brief
Sur-Reply to: UBS Financial Services Incorporated of Puerto Rico's Reply in Further
Support of its Motion to Enforce the Plan of Adjustment and for Related Injunctive Relief*
(Docket Entry No. 22294) (the "ERS Ben. Sur-Reply").

**Add. 003**

On September 23, 2022, the ERS Beneficiaries filed a motion to amend the FAC in Commonwealth Court and annexed their proposed amended complaint.  (See *UBS Financial Services Incorporated of Puerto Rico's Response to Informative Motion with Respect to the ERS Individual Plaintiff's Opposition at Docket No. 22175* (Docket Entry No. 22399, Ex. A) (the "Proposed New Complaint").)

B.     Confirmation of the Plan and the Underwriter Avoidance Action

On January 18, 2022, the Court confirmed the Plan.  (See *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority*, Docket Entry No. 19813 (the "Confirmation Order").)

The Plan became effective on March 15, 2022 (the "Effective Date").  (See *Notice of (A) Entry of Order Confirming Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al. Pursuant to Title III of PROMESA and (B) Occurrence of the Effective Date*, Docket Entry No. 20349.)

Pursuant to the Plan, upon the Effective Date, Avoidance Actions Trust Assets (as defined in the Plan § 1.108) were transferred to the Avoidance Actions Trust.  (Plan § 78.3.)  The Avoidance Actions Trust is administered by the Avoidance Actions Trustee.  (Plan § 78.4.)  The Avoidance Actions Trustee is authorized "to investigate, prosecute, settle and/or abandon  rights, Causes of Action, or litigation of the Avoidance Actions Trust" on behalf of the Trust.  (Plan § 78.6.)  Furthermore, ERS was to be dissolved "on or as soon as practicable subsequent to the Effective Date."  (Plan § 88.2.)  Upon dissolution of ERS, all remaining assets of ERS were to be transferred to the Commonwealth of Puerto Rico.  Id.

**Add. 004**

On September 15, 2022, the Avoidance Actions Trustee filed the Second

Amended Complaint in the Avoidance Action <u>Drivetrain, LLC v. Barclays, et al.</u>, Adv. Proc. No.

19-000280-LTS (the "Underwriter Action").  (Docket Entry No. 29 in Adv. Proc. No. 19-280)

(the "Underwriter Action Complaint").  UBS is a defendant in the Underwriter Action.  (<u>Id</u>. ¶ 4.)

II.

DISCUSSION

A.      <u>Jurisdiction</u>

Section 306(a)(2) of PROMESA confers on the district court "original but not

exclusive jurisdiction of all civil proceedings arising under this subchapter, or arising in or

related to cases this subchapter."  48 U.S.C.A. § 2166(a)(2) (Westlaw through P.L. 117-24).  The

jurisdictional language of section 306(a)(2) is analogous to that of the bankruptcy jurisdiction

statute, 28 U.S.C.A. § 1334(b).

The First Circuit has recognized that "related to" jurisdiction exists when the

outcome of a proceeding "potentially ha[s] some effect on the bankruptcy estate, such as altering

debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the

handling and administration of the bankrupt estate."  <u>Gupta v. Quincy Med. Ctr.</u>, 858 F.3d 657,

663 (1st Cir. 2017) (quoting <u>Middlesex Power Equip. & Marine, Inc. v. Town of Tyngsborough,</u>

<u>Mass.</u> (<u>In re Middlesex Power Equip. & Marine, Inc.</u>), 292 F.3d 61, 68 (1st Cir. 2002)).

Additionally, "[m]atters affecting 'the interpretation, implementation, consummation, execution,

or administration of the plan' remain in the bankruptcy court's jurisdiction post-confirmation." <u>In</u>

<u>re Brown</u>, No. 21-11284-GAO, 2022 WL 1200783 *3 (Bankr. D. Mass. Apr. 22, 2022) (quoting

<u>In re Resorts Int'l, Inc.</u>, 372 F.3d 154, 167 (3d Cir. 2004)).

**Add. 005**

Here, UBS seeks to enforce the Plan and enjoin ERS and the ERS Beneficiaries from prosecuting certain claims against UBS in the Commonwealth Action. (Mot. ¶¶ 1, 47.) Pursuant to section 91.1(g) of the Plan, the Court retains jurisdiction to resolve certain disputes arising under the Plan. Section 91.1(g) provides:

> (g) To resolve any cases, controversies, suits, disputes or other challenges of any kind that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order, Definitive Documents or any other contract, instrument, security, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents. (Plan § 91.1(g).)

The dispute underlying the Motion to Enforce the Plan is whether the ERS Beneficiaries, as individual plaintiffs, are entitled to recover additional monies—beyond the bargained-for treatment of their ERS pension benefit rights that is incorporated in the Plan—through the Commonwealth Action, either for themselves directly or for the benefit of the now-defunct ERS. These issues are related to the administration and execution of the Plan. Thus, this Court retains jurisdiction to resolve this dispute concerning the interpretation and enforcement of the Plan and the confirmation order.

With respect to the merits of UBS' request for an order enjoining further prosecution of Commonwealth Action pursuant to sections 78 and 91.1 of the Plan, the Court will first consider the nature of the claims asserted by the ERS Beneficiaries in the Commonwealth Action. Next, the court will assess the relevant provisions of the Plan. Finally, the Court will weigh whether the continued prosecution of the Commonwealth Action frustrates the purpose of the Plan, infringes on the authority of the Avoidance Actions Trustee, and otherwise disrupts certain settlements and agreements incorporated in the Plan.

B.     Derivative Claims Asserted in the Commonwealth Action

        In analyzing whether the Court should exercise jurisdiction to enjoin the

prosecution of the Commonwealth Action, the Court must first address whether the claims

asserted in the Commonwealth Action are direct claims based on an injury sustained by the

individual ERS Beneficiaries or derivative claims based on an injury sustained by ERS.  Courts

have found that consideration of "whether a suit seeks to impose derivative liability a helpful

way to assess whether it has the potential to affect the bankruptcy *res* . . . [. T]he touchstone for

bankruptcy jurisdiction remains 'whether its outcome might have any 'conceivable effect' on the

bankruptcy estate.[5]'" Quigley Co. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.),

676 F.3d 45, 57 (2d Cir.2012) (citing In re Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d

Cir.1992).  Here, the Court considers whether the claims asserted by the ERS Beneficiaries

would alter the rights of the Commonwealth, the Avoidance Actions Trustee, or other creditors;

redirect Avoidance Actions Trust Assets, or otherwise limit the distribution of assets from the

estate.

        "In assessing whether a claim is derivative, we inquire into the factual origins of

the injury and, more importantly, into the nature of the legal claims asserted."  Marshall v. Picard

(In re Bernard L. Madoff Inv. Sec. LLC), 740 F.3d 81, 89 (2d Cir. 2014) ("Madoff II").

---

[5]      Section 301(c)(5) of PROMESA provides that the term "property of the estate," when
used in incorporated provisions of the Bankruptcy Code, means property of a Title III
debtor.  48 U.S.C. § 2161(c)(5); see Gracia-Gracia v. Fin. Oversight & Mgmt. Bd. for
P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 939 F.3d 340, 349 (1st Cir. 2019)
("PROMESA and the municipal bankruptcy code instruct that we replace all instances of
'property of the estate' that appear in the incorporated provisions of the bankruptcy code
with 'property of the debtor.'" (citation omitted)).  In Madoff II, the Court considered
whether the prosecution of plaintiffs' derivative claims caused harm to the "property of
estate" in the context of section 541 of the Bankruptcy Code.  Section 541 of the
Bankruptcy Code was not incorporated in PROMESA.  See 48 U.S.C. § 2161(a). The
Court's analysis here focuses on harm to the debtor.

**Add. 007**

Derivative claims in the bankruptcy context are those "that arise from harm done to the estate"
and that "seek . . . relief against third parties that pushed the debtor into bankruptcy." Id.  An
alleged derivative injury is "a secondary effect from harm done to [the debtor]." St. Paul Fire &
Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 704 (2d Cir. 1989).

   The ERS Beneficiaries' asserted injury is diminution of the pension benefits they
expected to be able to receive from ERS.  (ERS Ben. Joinder ¶ 6.)  ERS promised to pay certain
pension benefits to individual employees who elected to participate in the pension system
administered by ERS.  The causes of action asserted by the ERS Beneficiaries in the FAC and
the Proposed New Complaint are general negligence and other breach of duty claims against
UBS arising from its role as an underwriter and/or investment advisor to ERS.  The ERS
Beneficiaries allege that UBS' wrongdoing caused "multi-million dollar damage" to ERS and
"damages" of an unspecified nature to the Beneficiaries.  (See generally Mot. Ex. A.)

   The FAC is devoid of any allegations of direct contact between UBS and the ERS
Beneficiaries, individually, or of any specific effect of UBS' allegedly wrongful conduct toward
ERS on the ERS Beneficiaries' pension benefits.  Rather, the FAC asserts four causes of action
arising from contractual relations between UBS and ERS.  (Mot. Ex. A, FAC ¶¶ 6.1, 7.1, 8.3, and
9.2.)  Thus, the ERS Beneficiaries' asserted claims to recover for—or "on the basis of"—an
injury incurred by ERS are derivative of ERS' right to recover on its own behalf.

   If a claim is "a general one, with no particularized injury arising from it, and if
that claim could be brought by any creditor of the debtor, the trustee is the proper person to
assert the claim, and the creditors are bound by the outcome of the trustee's action." St. Paul,
884 F.2d at 701.  As in St. Paul, the ERS Beneficiaries only articulate a generalized injury—
anticipated diminution of retirement benefits as a result of ERS' financial condition.  (ERS Ben.

Opp. ¶ 23; ERS Ben. Joinder ¶ 5.)  During oral argument, counsel for the ERS Beneficiaries

noted "[The ERS Beneficiaries] are [. . .] not going to have the pensions they use[d] to have.

Those pensions have been reduced benefits."  (See September 28, 2022, Hr'g Tr. 93:6-8; Docket

Entry No. 22417.)  Such an injury is common to all ERS retirees receiving pensions.

The ERS Beneficiaries argue that the FAC asserts non-derivative general tort

claims against UBS based on UBS' alleged breach of contractual obligations and fiduciary duties

owed to ERS.  (ERS Ben. Opp. ¶ 23.)  The ERS Beneficiaries ground this argument in three

Puerto Rico statutes: Article 1802 (31 L.P.R.A. § 5141), Act No. 3-2013 (3 L.P.R.A. § 786-1),

and Article 517 of Act No. 53-2021.

Article 1802, Puerto Rico's general tort statute, provides that "[a] person who by

an act or omission causes damage to another through fault or negligence shall be obliged to

repair the damage so done."  31 L.P.R.A. § 5141.  The second cause of action in the FAC asserts

claims for violations of "section 1802 of the Puerto Rico Civil Code /UBS and UBS Consulting."

(FAC ¶¶ 7.1-7.2)  Specifically, the FAC alleges "gross[] negligen[ce] and illicit conduct of UBS

and UBS Consulting . . . while providing the services they were required to render to [ERS] and

the breach by such defendants of their contractual, non-contractual and fiduciary duties to the

[ERS] caus[ing] the [ERS] multi-million dollar damages." (FAC ¶ 7.2.)  Thus, the tort claim

asserted in the FAC is, on its face, derived from contractual relations between UBS and ERS that

allegedly resulted in harm to ERS.  Any purported injury sustained by the ERS Beneficiaries was

a secondary harm.  See St. Paul, 884 F.2d at 704.

The ERS Beneficiaries cite Act No. 3-2013 as an independent foundation for

direct claims against UBS.  The parties agree that Act No. 3-2013 allows ERS, ERS participants,

and ERS pensioners to sue underwriters in connection with ERS' issuance of pension obligation

**Add. 009**

bonds. (Mot. ¶ 5.) (ERS Ben. Opp. ¶¶ 7, 17.) Act No. 3-2013, which was enacted several years

before the 2017 filing of the Title III Petition and consummation of the Plan in 2022, provides:

> Cause for action is hereby recognized to the participants and
> pensioners of the Employees Retirement System of the Government
> of Puerto Rico and the Judiciary to sue, pro se, nongovernment
> investment advisers and underwriters in any transaction in which
> pension obligation bonds have been issued by the Employees
> Retirement System of the Government of Puerto Rico and the
> Judiciary, for damages caused to the System or its beneficiaries. (3
> L.P.R.A. §§ 786-1, et seq.)

While the FAC alleges that ERS was damaged by the actions of UBS, it alleges

no facts identifying any damage to the ERS Beneficiaries apart from the alleged weakening of

ERS' financial condition, which diminished ERS' ability to fulfil its benefit payment obligations.

The ERS Beneficiaries' claim for benefits was a claim against ERS, and has been restructured

through the consummated Plan by the substitution of a new obligor (the Commonwealth of

Puerto Rico) and a new dedicated funding source (the Pension Reserve Trust) for ERS and the

assets of ERS. To the extent Act No. 3-2013 granted a cause of action to recoup damages

suffered by ERS or by ERS plan participants or pension beneficiaries by reason of an

underwriter's business dealings with UBS, the cause of action was derivative of ERS' claims.

As a result of the confirmation and consummation of the Plan, which protects the ERS

Beneficiaries' accrued pension benefits and, as part of the series of settlements and compromises

inherent in such a plan, transfers ERS' assets, including its claims against UBS, the ERS

Beneficiaries are no longer in a position to assert claims on ERS' behalf under Act 3-2013.

Indeed, the Plan redeploys any potential proceeds of litigation against UBS to support recoveries

for other creditors. The Commonwealth Action thus seeks to recover assets that, under the

confirmed Plan, neither belong to ERS nor are resources designated to cover ERS' former

obligations to the ERS Beneficiaries.

Article 517 of Act No. 53-2021 provides that "[a]djustment Plan transactions cannot be used to mitigate causes of action under Act No. 3-2013, as amended." The ERS Beneficiaries argue Article 517 of Act No. 53-2021 protects the ERS Beneficiaries' right to prosecute any action and recover damages against UBS, notwithstanding the reorganization of ERS under the terms of the Plan. (ERS Ben. Opp. ¶¶ 7, 17.) The Court rejects the argument that Article 517 of Act No. 53-2021 precludes the Plan from nullifying the ERS Beneficiaries' right to prosecute the Commonwealth Action under Act No. 3-2013. This Court has held that "[o]bligations arising from Commonwealth statutes, including statutes providing employees the right to accrue pension or other retirement benefits, give rise to claims which can be impaired and discharged pursuant to the Plan." (FFCL ¶ 153 (citing 11 U.S.C. § 101(5)(A); Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35-36 (1st Cir. 2009); In re Fin. Oversight & Mgmt. Bd. for P.R., 635 B.R. 201, 212–14 (D.P.R. 2021)).) As explained above, the Plan resolves the ERS Beneficiaries' claims for pension benefits and thus precludes the claims they seek to pursue through the Commonwealth Action.

The ERS Beneficiaries' claims in the Commonwealth Action are predicated solely upon secondary harms flowing from UBS' contractual relationship with ERS. Even if the financial distress that led to the Plan's reduction of future benefits was a causal factor in ERS' demise, the causal chain to the injuries claimed by the ERS Beneficiaries is quite indirect and, by definition, starts with injuries inflicted on ERS, not its beneficiaries. The primary injury (if any) was sustained by ERS. The Puerto Rico statutes cited by the ERS Beneficiaries do not in and of themselves elevate a derivative claim to a direct claim.

**Add. 011**

C.    Enforcement of the Plan

In confirming the Plan, the Court noted that "[t]he Plan eliminates any reduction in accrued pensions and certain other retiree benefits for retired and active [ERS] employees and provides for the creation of the Pension Reserve Trust . . . ." (FFCL ¶ 131.)  (See also Plan §§ 1.389, 83.2.)  The Pension Reserve Trust has clearly defined contribution terms and is managed by an independent entity.  (See FFCL ¶ 198; see also Plan §§ 83.1-83.4.)  The ERS Beneficiaries do not dispute that their accrued benefits are protected by the Plan or that they are beneficiaries of the Pension Reserve Trust.  Rather, the ERS Beneficiaries seek to recover additional monies through the Commonwealth Action based on UBS' business dealings with ERS.

The Plan calls for the dissolution of ERS "on or as soon as practicable subsequent to the Effective Date." (Plan § 88.2.)  The Avoidance Actions Trust Assets were to be transferred to the Avoidance Action Trust (or the Commonwealth) on or soon after the Effective Date. (Plan § 78.3.)  Pursuant to the Plan, the Avoidance Actions Trust is administered by the Avoidance Actions Trustee.  (Plan § 78.4.)

The Special Claims Committee of the Financial Oversight and Management Board for Puerto Rico (the "SCC"), and the Official Committee of Unsecured Creditors of the Debtors (except the Puerto Rico Public Buildings Authority and the Puerto Rico Sales Tax Financing Corporation) (the "UCC"), commenced the Underwriter Action on behalf of ERS in 2019, prior to the confirmation of ERS' Plan of Adjustment.  (See Docket Entry No. 1 in Adv. Proc. No. 19-280.)

Upon joint application by the Avoidance Actions Trustee, the SCC, and the UCC following confirmation of the Plans of ERS and the Commonwealth, the Court discharged the SCC and the UCC of further responsibility in the Underwriter Action and substituted the

**Add. 012**

Avoidance Actions Trustee as Plaintiff.  (See Docket Entry Nos. 34 and 39 in Adv. Proc. No. 19-280.)

The Second Amended Complaint in the Underwriter Action asserts various causes of action against UBS arising from UBS' role as an underwriter and investment advisor to ERS in connection with the 2008 bond issuance.  (See generally Underwriter Action Complaint.)

The Avoidance Actions Trustee is authorized "to investigate, prosecute, settle and/or abandon  rights, Causes of Action, or litigation of the Avoidance Actions Trust" on behalf of the Trust.  (Plan § 78.6.)  The trust accumulates assets for the benefit of general creditors, not for the benefit of ERS pensioners.  (See generally Plan §§ 78.1-78.15.)

In sum, the ERS Beneficiaries have rights under the Plan and their claims against ERS have been discharged.  The ERS Beneficiaries are bound by their treatment under the Plan. The Plan also provides a future payment structure for the ERS Beneficiaries through the Pension Reserve Trust.  Separately, the Plan provides the Avoidance Actions Trustee with exclusive authority to prosecute claims and recover monetary awards for the benefit of the Avoidance Actions Trust beneficiaries.  The Avoidance Action Trustee is now pursuing ERS' claims against UBS and other Underwriters on behalf of the Avoidance Actions Trust.

Section 105(a) of the Bankruptcy Code, as incorporated by section 301(a) of PROMESA, recognizes the Court's authority to issue any order that is necessary or appropriate to carry out the provisions of PROMESA.  11 U.S.C. § 105(a); 48 U.S.C. § 2161(a).  UBS, the UCC, and the Avoidance Actions Trustee urge the Court to enjoin the prosecution of the Commonwealth Action because the action infringes on the authority of the Avoidance Actions Trustee and disrupts certain settlements and agreements incorporated in the Plan.

Continued parallel litigation of derivative claims by the ERS Beneficiaries will infringe on the Avoidance Actions Trustee's ability to exercise litigation control and resolve the Underwriter Action, for the benefit of creditors other than the pension beneficiaries. These considerations, collectively, weigh in favor of the Court exercising its authority under section 105(a) of the Bankruptcy Code to enforce the Plan and enjoin the prosecution of the Commonwealth Action insofar as the ERS Beneficiaries seek to prosecute claims against UBS based on its business dealings with ERS.

III.

CONCLUSION

For the foregoing reasons, the Motion to Enforce the Plan is granted.  The ERS Beneficiaries are hereby enjoined from prosecuting the Commonwealth Action insofar as the ERS Beneficiaries assert claims against UBS that are based in any way on its business dealings with ERS.  This Memorandum Opinion resolves Docket Entry No. 21651 in Case No. 17-3283 and Docket Entry No. 1364 in Case No. 17-3566.


SO ORDERED.

Dated:  November 29, 2022

 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

**Add. 014**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO et al.,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17-BK-3283 (LTS)<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO,<br><br>Debtor. | PROMESA<br>Title III<br><br>Case No. 17-BK-3566 (LTS) |

ORDER DENYING MOTION FOR RECONSIDERATION UNDER BANKRUPTCY RULE 9023

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**Add. 015**

The Court has received and reviewed the *Motion for Reconsideration Under Bankruptcy Rule 9023* (Docket Entry No. 23058 in Case No. 17-3283)[2] (the "Reconsideration Motion"), filed by Pedro José Nazario Serrano, Joel Rivera Morales, María de Lourdes Gómez Pérez, Héctor Cruz Villanueva, Lourdes Rodríguez, and Luis M. Jordán Rivera, and Juanita Sosa Pérez (collectively, the "Movants").  The Motion seeks reconsideration of this Court's *Memorandum Opinion and Order Granting the Motion to Enforce the Plan* (Docket Entry No. 22927 in Case No. 17-3283; Docket Entry No. 1386 in Case No. 17-3566) (the "Memorandum Order").[3]  The Memorandum Order granted *UBS Financial Services Incorporated of Puerto Rico's Motion to Enforce the Plan of Adjustment and for Related Injunctive Relief* (Docket Entry No. 21651 in Case No. 17-3283 and Docket Entry No. 1364 in Case No. 17-3566, the "Motion to Enforce the Plan"), filed by UBS Financial Services Incorporated of Puerto Rico ("UBS").  The Motion to Enforce the Plan sought to enforce the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico et al.* (Docket Entry No. 19784) (the "Plan") by requesting an order prohibiting Movants and the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") from prosecuting certain claims in the pending action captioned <u>Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico v. UBS Financial Services Inc. of Puerto Rico</u>, Civ. No. KAC-2011-1067 (the "Commonwealth Action").  (Mot. to Enforce ¶¶ 1, 47.)  The Court has considered carefully all the parties' submissions.[4]  For the following reasons the Motion is denied.

---

[2]    All docket entry references are to entries in Case No. 17-3283.

[3]    Capitalized terms used but not otherwise defined herein have the meanings given to them in the Memorandum Order.

[4]    The written submissions comprise the *UBS Financial Services Incorporated of Puerto*

**Add. 016**

<u>DISCUSSION</u>

A party seeking relief under Rule 59(e)[5] must: (i) clearly establish a manifest

error of law or fact; (ii) clearly establish a manifest injustice; (iii) present newly discovered or

previously unavailable evidence; or (iv) establish an intervening change in controlling law.  <u>See</u>

<u>Marie v. Allied Home Mortg. Corp.</u>, 402 F.3d 1, 7 n.2 (1st Cir. 2005).  "[A] motion for

reconsideration of a previous order is an extraordinary remedy that must be used sparingly

because of interest in finality and conservation of scarce judicial resources."  <u>Lopez Jimenez v.</u>

<u>Pabon Rodriguez (In re Pabon Rodriguez)</u>, 233 B.R. 212, 220 (Bankr. D.P.R. 1999), <u>aff'd</u>,

2000 WL 35916017 (B.A.P. 1st Cir. 2000), <u>aff'd</u> <u>sub</u> <u>nom.</u> <u>Lopez Jimenez v. Lee (In re Pabon</u>

<u>Rodriguez)</u>, 17 F. App'x 5 (1st Cir. 2001).  Accordingly, a Rule 59(e) motion "does not provide

a vehicle for a party to undo its own procedural failures or to introduce new evidence or advance

arguments that could and should have been presented to the district court prior to judgment."

<u>Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am., LLC</u>, 794 F.3d 200, 208 (1st Cir.

---

*Rico's Opposition to Motion for Reconsideration under Bankruptcy Rule 9023* (Docket
Entry No. 23175), filed by UBS; *Response of the Avoidance Actions Trustee to the
Motion for Reconsideration [DE 23058] of the ERS Beneficiaries* (Docket Entry No.
23165), filed by Drivetrain, LLC (the "Avoidance Actions Trustee"); *Joinder of the
Official Committee of Unsecured Creditors  to the Response Of The Avoidance Actions
Trustee to the Motion for Reconsideration of the ERS Beneficiaries* (Docket Entry No.
23166), filed by the Official Committee of Unsecured Creditors; and *Consolidated Reply
to Docket Numbers 23165, 23166 and 23175* (Docket Entry No. 23194), filed by the
Movants.

[5]     Rule 59(e) is made applicable in this proceeding by Federal Rule of Bankruptcy
Procedure 9023.  The Federal Rules of Bankruptcy Procedure are made applicable in
these Title III cases by section 310 of the Puerto Rico Oversight, Management, and
Economic Stability Act ("PROMESA"), 48 U.S.C. § 2170 <u>et seq.</u>  The outcome of the
instant contested matter would, however, be the same under the standard applicable to a
motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, made applicable
by Federal Rule of Bankruptcy Procedure 9024.  <u>See</u> <u>Villanueva-Mendez v. Nieves</u>
<u>Vazquez</u>, 360 F. Supp. 2d 320, 322 (D.P.R. 2005), <u>aff'd</u>, 440 F.3d 11 (1st Cir. 2006).

**Add. 017**

2015) (citation and internal quotation marks omitted). Pertinently, a party's disagreement with the court's decision and desire to have the court "rethink its holding" are not grounds for reconsideration. Rosario-Mendez v. Hewlett Packard Caribe, 660 F. Supp. 2d 229, 234 (D.P.R. 2009).

The Reconsideration Motion challenges the Court's exercise of authority pursuant to section 105(a) of the Bankruptcy Code to enjoin the prosecution of the Commonwealth Action. Movants argue that the tort claims that they have asserted against UBS pursuant to section 1802 of the Puerto Rico Civil Code (31 L.P.R.A. § 5141) ("Article 1802") are not derivative in nature, and thus are not owned by ERS. (See Mot. at 3-4, 8.) Movants also contend that the relief sought in the Commonwealth Action (damages for economic injury sustained by individual plaintiffs) is distinct from the relief sought by the Avoidance Actions Trustee through the Underwriter Action (disgorgement of underwriting fees). (See Mot. at 6-7.) Finally, Movants contend that the Memorandum Order constitutes a "judicial taking" of the Movants' individual causes of actions. (See Mot. at 7.)

In its decision, the Court held that the Movants' asserted claims against UBS, based on UBS' business dealings with ERS, are derivative of claims owned by ERS. (Mem. Ord. at 7-11.) The Court held that the Avoidance Actions Trustee, pursuant to section 78.6 of the Plan, is granted exclusive authority to prosecute, settle, or abandon claims on behalf of Avoidance Actions Trust (including claims asserted by ERS to recover damages from UBS through the Underwriter Action). (See Mem. Ord. at 13.) The Court also determined that the continued parallel litigation of the derivative claims by the Movants would infringe on the Avoidance Actions Trustee's "ability to exercise litigation control and resolve the Underwriter Action." (Mem. Ord. 14.)

**Add. 018**

Movants' arguments do not establish a basis for reconsideration.  First, the
Memorandum Order carefully addressed and rejected Movants' assertion that they are entitled to
recover damages from UBS pursuant to Article 1802, including the argument that Movants' tort
claims are not derivative claims, and the Court concluded that the damages claimed by Movants
are a "secondary harm" flowing from UBS's contractual relationship with ERS.  (See Mem. Ord.
at 11.)  The Movants' attempt to distinguish the relief sought in the Underwriter Action from the
relief sought in the Commonwealth Action is misplaced.  As discussed at length in the
Memorandum Order, the claims Movants seek to prosecute through the Commonwealth Action
that are based on business dealings between UBS and ERS are derivative of claims owned by
ERS.  The Court held that the Avoidance Actions Trustee has authority to prosecute claims on
behalf of ERS "to recover monetary awards for the benefit of the Avoidance Actions Trust."
(Mem. Ord. at 13.)   Thus, Movants have not identified any facts overlooked by this Court nor
identified any law that was not previously examined by this Court regarding the Movants'
derivative claims or interpretation of the Plan provisions related to the Avoidance Actions
Trustee.

Second, Movants' new argument that enjoining prosecution of the
Commonwealth Action constitutes a "judicial taking" lacks merit.  Through the Motion to
Enforce the Plan, UBS, in its role as an underwriter and investment advisor to ERS (a Title III
debtor), sought an order to enjoin the prosecution of the Commonwealth Action against UBS
pursuant to sections 78 and 91.1(g) of the Plan, arguing that the underlying claims belonged to
ERS rather than to individual beneficiaries.  (See Mem. Ord. at 6.)   The crux of the dispute
between the parties in this contested matter was competing claims regarding ownership, which
the Court resolved in favor of ownership by ERS and its successor in interest.  The Court did not

**Add. 019**

deprive the ERS Beneficiaries of any rights that had belonged to them.  The Memorandum Order simply resolved the dispute between UBS and Movants, concluding that Movants had received bargained-for treatment of their ERS pension benefit rights under the terms of the Plan and that their claims against ERS have been discharged.  (See Mem. Ord. at 6.)   The resolution of the dispute concerning rights under the Plan cannot be a taking within the meaning of the Fifth Amendment.  See In re Lazy Days' RV Center Inc. et. al., 724 F.3d 418, 425 (3d Cir. 2013) (noting that, in the context of bankruptcy, the adjudication of "disputed and competing claims" under a settlement agreement cannot be a taking).  Also, Movants' argument concerning a judicial taking was raised for the first time in the Reconsideration Motion, warranting its rejection for that reason alone.  See Venegas-Hernandez v. Sonolux Records, 370 F.3d 183, 189-90 (1st Cir. 2004) ("[P]arties cannot use Rule 59(e) motions to raise new arguments that could have been made before judgment issued or to undo their own procedural failures."); see also Vega v. Hernandez, 381 F. Supp. 2d 31, 35 (D.P.R. 2005) (noting that motions for reconsideration are not vehicles for the presentation of new theories).

CONCLUSION

Movants have failed to establish that the Court made a manifest error of law or fact.  Moreover, Movants have not identified any intervening change in controlling law since the Court made its decision, nor do Movants refer to any previously unavailable or newly discovered facts that would affect the Court's legal conclusions underlying the decision.  Accordingly, the Reconsideration Motion is denied.

This Order resolves Docket Entry No. 23058 in Case No. 17-3283.


SO ORDERED.

Dated:  January 26, 2023

 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

**Add. 021**